# In the United States Court of Federal Claims

Nos. 10-106C, 10-127C (consolidated)
(Filed Under Seal May 13, 2010)
(Reissued for Publication May 28, 2010)
TO BE PUBLISHED

|  |  |
|---|---|
| ) | Challenge to the exercise of |
| ) | options; bid protest jurisdiction; |
| MAGNUM OPUS TECHNOLOGIES, INC.  ) | "in connection with a procurement |
| and THE HEALING STAFF, INC.,  ) | or proposed procurement"; |
| ) | allegation that procurement should |
| Plaintiffs,  ) | have been subject to full and open |
| ) | competition; standing; non-trivial |
| v.  ) | competitive injury which can be |
| ) | redressed by judicial relief; |
| THE UNITED STATES,  ) | prejudicial harm; waiver; *Blue &* |
| ) | *Gold Fleet, L.P. v. United States*, |
| Defendant,  ) | 412 F.3d 1309 (Fed. Cir. 2007); |
| ) | *Freightliner v. Caldera*, 225 F.3d |
| and  ) | 1361 (Fed. Cir. 2000); FAR |
| ) | § 17.207; priced option; |
| LUKE & ASSOCIATES, INC. and  ) | evaluating pricing in ID/IQ |
| TERRAHEALTH, INC.,  ) | contracts; balance of hardships |
| ) | favoring tailored injunctive relief |
| Defendant-Intervenors.  ) |  |
| ) |  |
| ) |  |

   Barbara A. Duncombe, Taft Stettinius & Hollister LLP, Dayton, Ohio, for plaintiff Magnum Opus Technologies, Inc.  Suzanne Sumner and Casie E. Hollis, Taft Stettinius & Hollister LLP, Dayton, Ohio, of counsel.

   Michael P. Foley, Sky W. Smith, and Anthony J. Perfilio, Rendigs, Fry, Kiely & Dennis, LLP, Cincinnati, Ohio, for plaintiff The Healing Staff, Inc.

   Elizabeth A. Speck, Trial Attorney, Deborah A. Bynum, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, and Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

   Leigh T. Hansson, Reed Smith LLP, Washington, D.C., for defendant-intervenor Luke & Associates, Inc.  Gregory S. Jacobs, Daniel Z. Herbst, Joelle E.K. Laszlo, Reed Smith LLP, Washington, D.C. and Jeremy R. Berger, Reed Smith LLP, Philadelphia, PA, of counsel.

   Patrick T. Rothwell, PilieroMazza, PLLC, Washington, D.C., for defendant-intervenor TerraHealth, Inc.  Antonio R. Franco, Piliero Mazza, PLLC, Washington, D.C., of counsel.

**OPINION AND ORDER**[*]

<u>GEORGE W. MILLER</u>, Judge

These consolidated bid protests arise out of the United States Air Force's ("Air Force's") exercise of options on four of six indefinite delivery/indefinite quantity ("ID/IQ") contracts to supply health care service providers.  Plaintiffs Magnum Opus Technologies, Inc. ("Magnum Opus") and The Healing Staff, Inc. ("Healing Staff") held the two ID/IQ contracts for which the Air Force chose not to exercise the options.  Plaintiffs contend that the exercise of the options of the other four awardees violated the Competition in Contracting Act ("CICA") and Federal Acquisition Regulation ("FAR") § 17.207, and the Air Force was legally required to hold a new competition for the option work.  Defendant and defendant-intervenor Luke & Associates, Inc. ("Luke," collectively "defendants") counter that this court lacks jurisdiction to consider cases arising out of options and plaintiffs lack standing to assert these claims.  Defendants also contend that the Government's exercise of the options complied with the law.

The Court heard oral argument on March 17, 2010 and conducted an evidentiary hearing regarding injunctive relief on April 22, 2010.  For the reasons stated below, defendants' motions to dismiss for lack of subject matter jurisdiction are **DENIED**.  Defendants' motions to dismiss plaintiffs' complaints for lack of standing are **DENIED**.  Defendants' motions to dismiss for

---

[*] This Opinion and Order was originally filed under seal on May 13, 2010 pursuant to the protective order entered on February 23, 2010 (docket entry 12).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a Notice of Filing Opinion with Proposed Reactions on May 21, 2010 (docket entry 95), which unfortunately failed to reveal the rationale for the proposed redactions.  Pursuant to the Court's Order of May 24, 2010 (docket entry 96), the parties filed a Revised Notice of Filing Opinion with Proposed Redactions on May 27, 2010, providing particularized explanations of the basis for each proposed redaction (docket entry 97).

The parties appear to view their agreement as largely sufficient to justify the redactions. The Court disagrees, and has carefully reviewed these proposed redactions, incorporating some and rejecting others as overly broad, redacting material beyond the stated rationale, or not concerning "protected information" as defined in the protective order.  *See Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 314 n.1 (2009).  Furthermore, the Government seeks to redact the terms of a settlement agreement, though they are easily discernable from the unredacted language and the agreement itself contains no confidentiality provision.  Competition sensitive information has been redacted but other redactions, though agreed to by the parties, relate to information that cannot properly continue to be maintained under seal.  Accordingly, the Court is reissuing its Opinion and Order dated May 13, 2010, with redactions indicated by three consecutive asterisks within brackets and with minor revisions to correct clerical errors.

failure to state a claim upon which relief can be granted are **DENIED**.  Plaintiffs' motions for judgment upon the administrative record are **GRANTED**.  Defendants' motions for judgment upon the administrative record are **DENIED**.[1]

## I.      Background

        In order to provide high-quality health care to members of the military and their families, the Air Force maintains at least 63 military treatment facilities ("MTFs") in 58 different geographic locations within the United States.  Plaintiff Magnum Opus's Memorandum in Opposition to Motions to Dismiss and Cross-Motion for Judgment on the Administrative Record at 4 n.4 ("Magnum's Mem.") (docket entry 40, March 8, 2010); Administrative Record ("AR") Tab 1 at 7 (docket entry 23, March 1, 2010).  In May 2005, the Air Force solicited proposals from contractors to recruit, qualify and retain health care workers to staff these MTFs.  Magnum's Mem. at 4.

### A.    The Request for Proposals

        The 2005 request for proposals ("RFP") contemplated awarding "up to a minimum of" five ID/IQ contracts for a four-year period, with two three-year option periods, for a total potential contract period of ten years.  AR Tab 1 at 22, 191.  The awardees would then compete for the award of individual task orders under the ID/IQ contracts.  AR Tab 1 at 23-25.  Task orders were to be awarded based on (1) the price of the task order; (2) the performance of the awardee on prior task orders; and (3) the quality of the proposed health care workers.  AR Tab 1 at 22-23.

        The Air Force required offerors to submit two Excel files containing pricing information, denominated Table 1 and Table 2.  Defendant's Reply Brief in Support of its Motion to Dismiss at 4 ("Def.'s Reply") (docket entry 50, March 15, 2010).  Table 1 contained price ceilings generally applicable for the duration of the contract, while Table 2 contained the offerors' specific proposals for performing the initial task orders under their ID/IQ contracts.  *Id.* at 5-6.  Table 1 was further subdivided into upper and lower portions.  *Id.* at 5.  The upper half of Table 1 contained twenty-eight labor categories of "common" medical personnel positions such as Clinical Nurse, Family Physician, Optometrist, and Pediatrician.  *Id; see also, e.g.*, AR Tab 2 at 247.  These "common" positions were to be staffed at all 63 MTFs, and the offerors had to provide a "Not to Exceed" ("NTE") price for each; that is, "the Task Order price may not exceed the price in the matrix."  AR Tab 1 at 22; *see* Def.'s Reply at 5.

        The lower half of Table 1 contained NTE ceiling rates for sixty-eight "non-common" positions, such as Anesthesiologist, Clinical Geneticist, Neurologist, and Periodontist, that would not be staffed at every MTF.  Def.'s Reply at 5; *see also, e.g.,* AR Tab 2 at 247-49.  Because

---

        [1]  Defendant-intervenor TerraHealth, Inc. ("TerraHealth") did not elect to file a motion for judgment upon the administrative record.

these positions did not exist at every location, certain cells within the table were shaded to let the offeror know that a particular position was not staffed at an individual locale, and thus there was no need to provide an NTE price.  Def.'s Reply at 5.

Due to the duration of the contract, the RFP set forth an Economic Price Adjustment (also referred to as an escalation rate) "to provide adjustments to the contract price as a result of changes in the economic behavior of the national economy," although the contractor could propose an alternate escalation rate.  AR Tab 1 at 33, 175.  That is, the RFP provided for a suggested escalation in pricing as the contract aged; however, "[o]ccupational labor rates regulated by the Service Contract Act (SCA) [were] not to be adjusted using this clause."  AR Tab 1 at 33.  The RFP also identified the positions covered by the Service Contract Act ("SCA"), 41 U.S.C. § 351 *et seq.*, and described "the wages and fringe benefits payable to each" under that law.  AR Tab 1 at 40.  Some of these SCA positions, such as Dietician and Medical Lab Technician, were on the list of common positions, while others, such as Nurse-Midwife and Occupational Therapist, were included as non-common positions.  *See, e.g.*, AR Tab 2 at 247-49.

The RFP contemplated, however, that the ID/IQ contract could be used to acquire *all* direct health services at Air Force MTFs, whether or not the positions were listed in the RFP. Def.'s Reply at 6-7.  That is, the Table 1 NTE ceiling rates were binding "[f]or labor categories in the Table 1 Pricing Worksheet," notwithstanding the potential for staffing other jobs not listed in Table 1.  AR Tab 1 at 24.  Ultimately, task orders were issued to fill an additional 52 labor categories that were not included in Table 1.  Def.'s Reply at 8.

### B.  *Evaluation and Contract Award*

The Air Force received twenty-eight responses to the RFP, ultimately awarding ID/IQ contracts to five entities: American Hospital Service Group, AR Tab 8; RLM Services, AR Tab 11; TerraHealth, AR Tab 12; Healing Staff, AR Tab 13; and Luke, AR Tab 9.  Although the Government reviewed the prices contained in the upper and lower portions of Table 1, along with the escalation rates, the total evaluated price of the contracts took into account only the upper half of Table 1 (that is, the 28 common positions).[2]  Def.'s Reply at 6; AR Tab 1 at 196.  The

---

[2]  Luke incorrectly asserts that "[t]hese price caps [in the upper half of Table 1] were administrative requirements for the submission and evaluation of subsequent task orders; they did not constitute the overall pricing of the ID/IQ Contract base or option periods."  Defendant-Intervenor Luke's Reply to Plaintiffs' Supplemental Briefs at 3 (docket entry 60, March 30, 2010) ("Luke's Supp. Br.").  The RFP stated that "[t]he Government will evaluate offers for award purposes by adding the total price of all Section B positions at all locations for each year of the base period, Option 1 and Option 2," AR Tab 1 at 196, although the Government represents that this was only in fact done for the "common" positions contained in the upper half of Table 1.  Def.'s Reply at 6 ("The total evaluated price of the contracts considered only the table 1 upper half, *i.e.*, 28 common positions for purposes of determining a fair and reasonable price for award of the overarching contracts.").  While there were other items that were priced

total evaluated price did not represent the minimum order or actual requirements of the contract. Def.'s Reply at 6.  In evaluating the proposals for award, the Government included the option periods.  *See* AR Tab 1 at 196.

Magnum Medical Personnel ("Magnum Medical"), a joint venture consisting of protégé Magnum Opus and mentor Sterling Medical Associates, Inc., protested the award twice.  The joint venture first protested the Air Force's finding that it was not responsible due to the low prices offered.  *Magnum Medical Personnel, A Joint Venture*, B-297687.2, 2006 CPD ¶ 99, 2006 WL 1843465, at *1 n.2 (Comp. Gen. June 20, 2006).  The Air Force referred the responsibility issue to the Small Business Administration ("SBA"), which issued a certificate of competency finding Magnum Medical to be responsible.  *Id.*  The Air Force nonetheless declined to award Magnum Medical a contract.  *Id.*

Magnum Medical filed a second protest alleging that its offer was not properly evaluated, particularly when comparing the security portion of its proposal to that of awardee Luke.  *Id.* at *6.  The GAO concluded that the proposals were roughly equivalent on the security requirement, and the Air Force had not supported its conclusion that Magnum Medical's proposal alone ought to be downgraded on that factor.  *Id.* at *7.  After the GAO decision recommending award to Magnum Medical, Magnum Medical received an ID/IQ contract.  AR Tab 10.  Magnum's ID/IQ contract was for a minimum order value of $500,000, and a maximum order value of $800,000,000 on the base contract period, $600,000,000 on the first option period, and $526,000,000 on the second option period.  AR Tab 10 at 3389-90.  Magnum Medical's ID/IQ contract was potentially worth, therefore, somewhere between a minimum of $500,000 and a maximum of $1.926 billion.  *Id.*  Healing Staff's ID/IQ contract contained similar terms.  AR 3888-89.

C.   *Elimination of NTE Price Caps*

Although the contracts stated that the prices bid by offerors in task order proposals could not be more than the NTE price identified in the offerors' responses to the RFP, by June of 2006 the Government observed that contractors were exceeding their NTE rates.  AR Tab 32 at 4427 (noting that only three of four contractors responded to a request for task order proposal and "[a]ll three of the respondents proposed prices exceeding their NTEs for a physician assistant"). In September of 2006, Magnum Medical quoted more than the NTE for a Clinical Nurse position, explaining that "in order to successfully recruit and retain a qualified Clinical Nurse our price must exceed our (NTE)"—otherwise, the position would suffer from increased turnover. AR Tab 33 at 4429.  The Air Force's practice in receiving such a request was to determine whether the supplied explanation was a "valid reason[] to excuse [the contractor] from their NTEs for that requirement."  AR Tab 35 at 4505.  After examining Magnum Medical's request,

---

under the ID/IQ contracts (*e.g.*, the non-common positions in the lower half of Table 1), the *only* prices actually evaluated at the time of award to determine fairness and reasonableness were the NTE rates in the upper half of Table 1.

the Air Force declined to excuse Magnum Medical from compliance with its NTE prices. The Air Force also asked for a "written corrective action plan" outlining the steps Magnum Medical was taking to "ensure compliance with the not-to-exceed provision . . . of [their] contract." AR Tab 43 at 4598.

Some of the difficulty in meeting NTEs resulted from upward pressure on the cost of SCA-covered positions due to new SCA Wage Determinations. In May of 2007, Magnum Medical asked to revise its NTE rates because the Fiscal Year 2007 SCA Wage Determinations had (1) included more positions than had previously been covered, and (2) raised the wage rates for certain previously covered jobs. AR Tab 34 at 4432. Joseph Boudreau, who was the Contracting Officer for most of the contract term,[3] noted the many issues raised by the SCA adjustments with respect to "non-professional" positions. AR Tab 35 at 4504. Mr. Boudreau concluded that "there [was] no 'clean' way" to make the requested adjustments given the contract language. AR Tab 35 at 4505. Mr. Boudreau noted that he had several options. He could (1) approve Magnum Medical's request, leaving task order competition to assure reasonable pricing; (2) deny Magnum Medical's request, since the contract did not provide for making the requested adjustment; (3) deny Magnum Medical's request, but allow for NTE adjustments on a case-by-case basis; or (4) undertake a complete, lengthy and complicated analysis of what the appropriate NTE would be for the SCA-covered positions. *Id.*

Mr. Boudreau came up with an "outside the box" solution—simply eliminating the NTE rates for the positions covered by the SCA. He observed that:

> We have to have some pricing in the contract, so we could never do away with all of our NTEs. The professional positions, and any other positions that are not covered by SCA, must remain in that table. No question about that. But I do not see an added benefit to having a larger number of NTE rates.

AR Tab 35 at 4506.[4]

---

[3] Mr. Boudreau passed away before the expiration of the base contract period. Magnum's Mem. at 36 n.30.

[4] He found the "pros" of this approach to include (1) "instantly resolv[ing] the immediate concern about one contractor's NTE rates and keep[ing] this issue from arising again"; (2) "emphasiz[ing] competition as the limiting factor on prices for the affected labor categories"; (3) "simplif[ying] the evaluation process for SCA-covered positions"; and (4) counteracting certain criticisms leveled at the program. AR Tab 35 at 4506. The "cons" of eliminating the NTEs were (1) the loss of the use of NTEs for budgeting purposes; (2) letting "Magnum Medical 'off the hook' on some of their low NTE rates"; and (3) losing the NTE rates for use in issuing unilateral task orders. *Id.* Mr. Boudreau decided that none of these cons outweighed the positives of his proposal. *Id.* He observed, however, that it would be necessary "to watch for collusion later on" and to present the idea carefully to the "COs in the field to ensure they don't miss the point that

Mr. Boudreau's solution was not implemented, but "[m]ost of the ID/IQ contract holders continued to submit proposals exceeding their NTE rates." Def.'s Reply at 11. The Air Force found it increasingly difficult to enforce compliance with NTE ceiling rates and became concerned that "due to the unforeseen complexity in the relationship between the NTE ceiling rates, escalation rates, and application of SCA increases, the overall delivery of healthcare services Air Force-wide could be impacted." Def.'s Reply at 11 (citing AR Tab 35 at 4506 ("I do not believe that our NTE tables provide reliable information for AFMS budgeting purposes.")). TerraHealth submitted requests for equitable adjustments seeking additional compensation on certain task orders due to changes in the SCA Wage Determinations. AR Tab 43 at 4591. The Air Force denied these claims, and TerraHealth filed complaints with this court and the Armed Services Board of Contract Appeals. Def.'s Reply at 11-12. The Air Force ultimately settled the cases, agreeing to "remove the requirement to comply with NTE ceiling rates in table 1 for purposes of subsequent task orders." Def.'s Reply at 12; AR Tab 43 at 4596.

On October 24, 2008, the Air Force issued identical bilateral contract modifications to each awardee's contract, which "remove[d] the requirement for the contractor to comply with not-to-exceed rates in Section B of the contract" (that is, in Table 1) and eliminated consideration of the NTEs from the criteria for awarding task orders.[5] *See, e.g.*, AR Tab 37 at 4509. None of the contract holders objected to the modifications, which, defendants contend, were intended to benefit all of the contractors equally. Luke's Reply in Suport of its Motion to Dismiss at 8 ("Luke's Reply") (docket entry 51, March 15, 2010).

### D.   Exercise of Options and Government Accountability Office ("GAO") Protests

On September 11, 2009, the Air Force began considering whether to exercise the first of the two three-year option periods provided for in the ID/IQ contracts, which were set to expire on November 14, 2009. AR Tab 45 at 4603. On September 15, 2009, the program manager indicated in a memorandum that he intended to exercise the first option for American Hospital Service Group, RLM Services, TerraHealth and Luke. AR Tab 45 at 4604. He stated that the "requirements for clinical support services have not changed" and that "[a]ll four contractors

---

competition will likely keep prices right where they are now." AR Tab 35 at 4507 ("If the prices do rise, they will probably be more reflective of market conditions, thus avoiding some potential performance problems.").

[5] At oral argument, counsel for the Government argued that the modification did not "delete" the NTE pricing *per se*, because the NTE charts remained in the contract "for purposes of reference for the Air Force in deciding and awarding subsequent task orders." March 17, 2010 Oral Argument Transcript at 50 ("Oral Arg. Tr.") (docket entry 58, filed March 23, 2010). Counsel, however, at various points during arguments and in briefing referred to the modification as "removing" the NTE prices. *See, e.g., id.* at 49, 62. Whether or not the NTEs were "deleted" or "removed," the effect of the modification was that the contractors did not have to comply with the NTE cap in bidding for task orders. The Court will not resolve this semantic debate.

have demonstrated substantial or satisfactory performance during the base period of their contracts."[6]  *Id.*  With respect to the remaining two contractors, the memorandum merely stated that "[a]lthough this request does not include contracts for the Healing Staff . . . and Magnum Medical, Joint Venture . . . there is enough capacity in the exercise of the four contract[] [options] . . . to meet the AFMS demand for services."  AR Tab 45 at 4604.

On September 16, 2009, American Hospital Service Group, RLM Services, Luke, and TerraHealth were notified that the Government intended to exercise their contract options.  AR Tabs 46-49 (as corrected, docket entry 52, March 16, 2010).  On October 20, 2009, the Air Force gave notice to Magnum Medical and Healing Staff that their options would not be exercised.  AR Tabs 50-51.

Magnum Medical and Healing Staff filed protests with the GAO on November 2, 2009, contending that the Air Force had conducted a limited competition without complying with the requisite laws and regulations and thus GAO review was warranted.  On November 12, 2009, the Air Force moved for summary dismissal of these protests on the ground that the exercise of an option is a matter of contract administration not subject to review.  Request for Summary Dismissal, B.297687.3, Protest of Magnum Medical Personnel, Joint Venture (Nov. 12, 2009) (docket entry 40-1, filed March 8, 2010).  The Air Force stated that "the contracting officer through the normal course of contract administration and in accordance with FAR 17.207," *id.* at 3, "determined that Magnum [Medical]'s and [Healing Staff's] options should not be exercised because doing so would not be the most advantageous method of fulfilling the government's needs."  *Magnum Medical JV; The Healing Staff, Inc.*, B-297687.3, B-297687.4, at 2 (Comp. Gen. Dec. 1, 2009) ("GAO Protest Dec.") (docket entry 33-1, filed March 4, 2010).

Also on November 12, 2009, Contracting Officer Clarinda Smith signed four identical documents, one for each of the option awardees, titled "Contracting Officer's Determination to Exercise 1st Option Period."  AR Tab 54 at 5221-24.  These memoranda stated that "[i]t is in the best interest of the Government to exercise the 1st option period" and that "[t]his determination is being made in accordance with FAR 17.207."  AR Tab 54 at 5221.  Ms. Smith further stated, following the outline of FAR § 17.207(c), that:

(a)  This modification itself will be used to provide written notice to the contractor, within the time period specified in the contract (Period of Performance: 15 Nov 2009 - 14 Nov 2012).
(b)  This contract does provide for economic price adjustment.
(c)  The contracting officer has determined that—
   (1)    Funds are not required since funding is at the task order level;

---

[6]  This assessment of performance was based on overall fill percentages, on-time fill rates, turnover percentages, and MTF/patient complaints.  AR Tab 45 at 4604.  The assessments identified Magnum Medical and Healing Staff as the least successful performers in most categories.  For instance, [***].  AR Tabs 15, 17, 19, 21, 23, 25.

   (2)  The requirement covered by the option fulfills an existing
       Government need;

   (3)  Exercising the option is the most advantageous method of fulfilling
       the Government's need, price and other factors (see paragraphs (d)
       and (e) of this section) considered; and

   (4)  This option is exempted from the synopsis requirement in
       accordance with FAR 5.202(a)(11), . . . ;

 (d) Prices under the initial Contract were deemed fair and reasonable at the time
   of award;

 (e) This determination took into account the Government's need for continuity of
   operations and potential costs of disrupting operations.

 (f) This option is being exercised in accordance with the terms of the option, the
   requirements of FAR Part 17, and FAR Part 6.  The option was evaluated at
   the time of award and is exercisable.

AR Tab 54 at 5221.

   Ms. Smith concluded each memorandum as follows: "Based on all the preceding facts, and taking into consideration the contractor's exceptional performance to date, the Option is considered fair and reasonable, and in the best interest of the Government."  *Id.*  On November 15, 2009, each of the four contracts were modified to exercise the first option period and to incorporate revised Wage Determinations for SCA positions.  AR Tabs 55-60.

   On December 1, 2009, GAO dismissed the protests of Magnum Medical and Healing Staff because the "protests concern a matter of contract administration outside the scope of our bid protest function.  Our Office generally will not review an agency's decision not to exercise an option because a contracting agency is not required to exercise an option."  GAO Protest Dec. at 2.  GAO declined to reach Magnum Medical's argument that the Air Force had failed to comply with FAR § 17.207 in deciding whether to exercise the options because, GAO determined, the argument had not been raised in a timely manner according to GAO rules.  *Id.* at 3 n.1.

   In mid-December, Magnum Medical and Healing Staff filed motions for reconsideration at the GAO.  Those motions had not been acted upon when, on February 18, 2010, Magnum Opus, one of the joint venturers in Magnum Medical, filed a bid protest in this Court (docket entry 1).  The complaint asserted that because the NTE pricing had been eliminated from the contracts, the Air Force had exercised unpriced options in violation of FAR § 17.207.  Magnum Opus Compl. ¶ 1.  On February 26, Healing Staff filed a separate complaint, which was consolidated with Magnum Opus's lawsuit.  *See* Order Consolidating Case with Civil Action No. 10-106, *The Healing Staff Inc. v. United States*, No. 10-127 (docket entry 7, Feb. 26, 2010).  Healing Staff also alleged a violation of FAR § 17.207, and further alleged that the Government wrongfully failed to disclose that it would use performance evaluations in determining whether to exercise the options.  Healing Staff alternatively asserted that the use of performance evaluations in deciding which options to exercise resulted in a *de facto* competition in which only two of six contractors were downselected, in violation of CICA.  Healing Staff Compl. ¶ 1.  Awardees Luke

and TerraHealth intervened in the consolidated lawsuits to defend the legality of the exercise of the options in their contracts (docket entry 20, Feb. 26, 2010 & docket entry 29, March 2, 2010).

## II.    Jurisdiction and Standing

The Court first addresses the threshold matters of whether it has subject matter jurisdiction and whether plaintiffs have standing to bring their complaints. *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 661 (2010). In reviewing defendant's motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), the court assumes that the allegations in the complaint are true and construes them in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). If, however, defendant challenges plaintiff's allegations, then plaintiff bears the burden of proving facts sufficient to invoke the court's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

### A.    Plaintiffs' Complaints Are Within the Court's Bid Protest Jurisdiction

As is pertinent here, this court may "render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*." 28 U.S.C. § 1491(b)(1) (emphasis added). The phrase "in connection with a procurement or a proposed procurement" is "very sweeping in scope." *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (quoting *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). The court may hear any claim "involv[ing] a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'" *Id.* at 1346 (quoting 41 U.S.C. § 403(2)).

Defendants argue that plaintiffs have not established that the Court has bid protest jurisdiction for two reasons: (1) plaintiffs' claims are not bid protests, but instead involve matters of contract administration that can be challenged, if at all, only under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* ("CDA"); and (2) plaintiffs have not alleged a "cardinal change" and therefore have not successfully invoked this court's jurisdiction.

### 1.    Plaintiffs' Allegations Regarding the Exercise of Other Awardees' Options Are Not Matters of Contract Administration

Defendants first maintain that the Court lacks jurisdiction because this dispute does not concern a "procurement or proposed procurement," but is instead merely plaintiffs' disagreement with the Government's refusal to exercise their contract options. Quarreling with the Government's decision regarding an option does not, defendants contend, give rise to a bid protest, but instead a CDA claim. Defendant's Motion to Dismiss at 8 (docket entry 24, March 1, 2010) ("Def.'s Mot."); Luke & Associates, Inc.'s Memorandum of Points and Authorities in Support of its Motion to Dismiss at 5 (docket entry 25, March 3, 2010) ("Luke's Mot."). Citing *Government Technical Services LLC v. United States*, 90 Fed. Cl. 522 (2009), defendants assert

that because the decision whether to exercise an option is solely a matter of contract administration, plaintiffs have not challenged any aspect of a procurement.  Def.'s Mot. at 8; Luke's Mot. at 5.

The court in *Government Technical Services* stated that the Government's failure to exercise an option on an existing contract was not an act "in connection with a procurement" within the meaning of the Tucker Act.  *Gov't Technical Servs.*, 90 Fed. Cl. at 529.  In that case, the plaintiff attempted to bring a bid protest alleging that the Army Corps of Engineers acted in bad faith by declining to exercise an option to extend plaintiff's contract.  *Id.* at 523.  Chief Judge Hewitt held that the decision not to renew a contract option was an issue of contract administration and that the plaintiff was required to pursue its remedies under the CDA rather than as a bid protest.  *Id.* at 528-31.  The court therefore dismissed plaintiff's attempted bid protest for lack of subject matter jurisdiction.  *Id.* at 531.

But to the extent that defendants contend that claims involving contract options must *always* be brought as CDA claims, the Court disagrees.[7]  *See* Def.'s Mot. at 10; Luke's Mot. at 5. This court has previously addressed challenges to the exercise of options as bid protests.[8]  For example, in *Magic Brite Janitorial v. United States*, 72 Fed. Cl. 719, 721 (2006), an incumbent contractor argued that the General Services Administration's ("GSA's") discretion regarding exercise of an option was limited by a term in its contract.  Instead of exercising the option, the GSA made award to another entity.  *Id.*  The court found that it possessed jurisdiction over the incumbent's bid protest because the Government was permitted to "cabin its discretion and make the exercise of an option less optional, via statute, regulation, or the terms of a contract."  *Id.*

In *Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 107 (2000), the protestor, a subcontractor, alleged that the United States Department of the Navy ("Navy") violated CICA

---

[7] Luke quotes from *Government Technical Services* for the proposition that "disputes arising from options and are, *without exception*, decided under the CDA."  *Gov't Technical Servs.*, 90 Fed. Cl. at 528 (emphasis added); *see* Luke's Mot. at 5.  Luke, however, takes this quote out of context.  In making this statement, Chief Judge Hewitt was not referring to *all* option cases, but rather to the "cases discussed by defendant," which were "without exception, decided under the CDA."  *Gov't Technical Servs.*, 90 Fed. Cl. at 528.  This statement certainly does not support the broader proposition that *all* cases involving options must be decided under the CDA.

[8] Similarly, the GAO has exercised jurisdiction over protests alleging that an agency's determination to exercise an option in an existing contract, rather than conduct a new procurement, was unreasonable or violated law or regulation.  *Major Contracting Servs., Inc.*, B-401472, 2009 CPD ¶ 170, 2009 WL 2933344, at *5 (Comp. Gen. Sept. 14, 2009); *Antmarin, Inc.*, B-296317, 2005 CPD ¶ 149, 2005 WL 2037551, at *1 n.2 (Comp. Gen. July 26, 2005); *Test Sys. Assocs., Inc.*, B- 244007, 93-1 CPD ¶ 274, 1993 WL 96568, at *3 (Comp. Gen. Mar. 29, 1993).

and FAR § 17.207 in exercising an option because "[i]n order to exercise [the] option, the contracting officer should have, at a minimum, performed some pricing analysis or market examination.  No analysis was performed or explanation provided."  As in the present case, the protestor further argued that, as a result of the violation, the work to be performed under the option should have been the subject of full and open competition and that the protestor would have bid upon such work in a competitive process.  *Id.*  Although the court ultimately found that the Navy had satisfied the requirements of FAR § 17.207, it exercised jurisdiction over the bid protest.  *Id.* at 107-08.

When a contractor seeks to bring a claim regarding the Government's action with respect to its own contract—that is, that the Government acted in bad faith in failing to exercise an option—the contractor must bring the claim pursuant to the CDA.  *See, e.g., Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1447 (Fed. Cir. 1997) (reviewing challenge to the Navy's failure to exercise an option and stating that the claims were "grounded in the CDA"); *Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 250 (2008), *aff'd*, No. 04-5105, 121 F. App'x 849 (Fed. Cir. 2005); *Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420, 436 (2002), *aff'd*, 356 F.3d 1372 (Fed. Cir. 2004).  But plaintiffs here do *not* allege that the Air Force improperly failed to exercise their options.  Instead, they contend that, because the NTE pricing was removed from the contracts, the Air Force's exercise of the options of *the other four* ID/IQ contractors violated FAR § 17.207.  Magnum's Mot. at 1; The Healing Staff, Inc.'s Motion for Judgment on the Administrative Record at 6 ("Healing Staff's Mot.") (docket entry 36, March 8, 2010).  In other words, because the NTE pricing was deleted from the ID/IQ contracts, the Government could not lawfully exercise the options because their pricing was not reasonably determinable from the contracts as required by FAR § 17.207(f).  *See* Magnum Mot. at 30-36; Healing Staff's Mot. at 6-8.  Thus, plaintiffs contend, to comply with CICA, the Air Force was required to either recompete the option work or issue a sole-source justification, neither of which was done.  Magnum Opus Compl. ¶ 109; Healing Staff Compl. ¶ 33.  Indeed plaintiffs' position is that the Air Force could not have lawfully exercised plaintiffs' own options because the NTE pricing had been deleted from their contracts as well.  To the extent that defendants characterize plaintiffs' allegations as challenges to the Air Force's decision not to exercise plaintiffs' options, they simply misconstrue plaintiffs' claims.[9]  Def.'s Mot. at 8-10; Luke's Mot. at 1.

Considering the plaintiffs' actual claims, the Court possesses jurisdiction.  The complaints do not allege matters of contract administration, but instead that the Air Force exercised the options in violation of law and regulation, namely CICA and FAR § 17.207(f).  *See Distributed Solutions*, 539 F.3d at 1345 n.1 ("A non-frivolous allegation of a statutory or

---

[9]  Thus Luke is incorrect in arguing that plaintiffs fail to state a claim upon which relief can be granted because they have not alleged that the Air Force acted in bad faith in exercising the broad discretion it possesses with respect to exercising options.  Luke's Mot. at 8-9.  The Government is obligated to comply with applicable laws and regulations.  *Magic Brite*, 72 Fed. Cl. at 721.  To state a claim upon which relief can be granted, it is sufficient for plaintiffs to allege that the Air Force violated FAR § 17.207(f); they are not obligated to allege bad faith.

regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."); *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 788 (1997) ("Defendant misconceives the nature of plaintiff's claim.  The complaint is not directed at the administration of . . . [the contracts].  Rather, [plaintiff] contends that the DoD violated CICA by expanding [the incumbent's] contract beyond its scope without opening up that additional work to competition.  Subject to establishing standing, [plaintiff] could make such a claim . . . .").  It is largely irrelevant that plaintiffs had their own contracts with options that could have potentially been exercised.  *CCL, Inc.*, 39 Fed. Cl. at 788-89.

   2.   <u>Plaintiffs Have Properly Brought a Bid Protest Alleging a "Violation of Statute or Regulation in Connection With a Procurement or a Proposed Procurement"</u>

   Defendants next contend that "in order to bring a bid protest alleging that an agency improperly failed to utilize competition in implementing a modification to an existing contract, a plaintiff must demonstrate that the modification resulted in a 'cardinal change' to the contract." Luke's Supp. Br. at 2; Defendant's Response to Plaintiffs' Supplemental Briefs at 3 ("Def.'s Supp. Br.") (docket entry 61, March 30, 2010).  Plaintiffs' complaint must be dismissed, defendants urge, because they do not allege that any cardinal change has occurred.  Def.'s Supp. Br. at 3; Luke's Supp. Br. at 4.  This court has considered bid protests arising in three circumstances: (1) a pre-award protest, which is an objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . of a contract," 28 U.S.C. § 1491(b)(1); (2) a post-award protest, which objects to "the award of a contract,'" *id.*; or (3) a protest objecting to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'"  *Id.*; *see OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005); *see also RhinoCorps Ltd. Co. v. United States*, 87 Fed. Cl. 481, 485 (2009). Plaintiffs allege, and the Court agrees, that their claims fall into the third category of bid protests, which encompasses—but is not limited to—"cardinal change" claims.  Magnum Opus's Supplemental Brief at 6-7 ("Magnum's Supp. Br.") (docket entry 56, March 22, 2010); Healing Staff's Supplemental Brief at 1-2 ("Healing Staff's Supp. Br.") (docket entry 55; March 22, 2010); *see CCL, Inc.*, 39 Fed. Cl. at 788-89.  This third grouping also includes protests such as challenges to an agency's decision to override CICA's automatic stay provision, *RAMCOR*, 185 F.3d at 1288-89, and to an agency's sole-source justification, *L-3 Commc'ns EOTech, Inc. v. United States*, 85 Fed. Cl. 667, 671-72 (2009).

   In general, this third category of bid protests involves allegations that an agency procured services "through a process that should have been the subject of competition."  *CCL, Inc.*, 39 Fed. Cl. at 789; *see also Savantage Fin. Servs.*, *Inc. v. United States*, 81 Fed. Cl. 300, 305 (2008) (jurisdiction exists where the agency's failure to procure "through a competitive process is exactly what [plaintiff] is protesting").  Defendants' attempt to show that *only* "cardinal change" cases may be heard is unavailing.  For example, in *RhinoCorps*, the plaintiff, a small business, challenged the Air Force's decision to obtain services supporting weapons systems development through an existing contract with a large business rather than soliciting a small business set-aside follow on contract.  *RhinoCorps,* 87 Fed. Cl. at 482.  The Government argued that plaintiff's claims were outside of the court's jurisdiction because they did not allege a modification that

created a "cardinal change" to the contract.  *Id.* at 489.  The court rejected this argument because "plaintiff does not anchor jurisdiction on the allegation that the work added to the . . . contract materially departed from the scope of the original procurement," but instead that the Air Force's justification not to use a small business set-aside was irrational, and thus a new procurement should have been conducted.  *Id.* at 489-90.

Plaintiffs here similarly claim that a regulatory violation requires a new procurement. The Government is generally required to engage in full and open competition, and must justify any failure to fully compete a contract award.  *See, e.g.*, FAR § 6.001.  Section 19.502-2 of the FAR, at issue in *RhinoCorps*, requires the agency to provide written justification for its decision to procure goods and services through less than full and open competition (that is, to limit competition to only small businesses).[10]  *See Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 445 (2009) (observing that FAR § 19.502-2 is "part of the standard of competitiveness required before an acquisition may be set aside for small business") (quotation omitted).  In this case, FAR § 6.001(c) enumerates an exception to full and open competition when the agency exercises a "priced option[]" that was "evaluated as part of the original competition."  Section 17.207(f), in turn, requires that "the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract."  Plaintiffs here, as in *RhinoCorps*, allege that the Government procured services without complying with these regulatory requirements.  They therefore allege a claim within the court's bid protest jurisdiction.  While the "cardinal change" allegation is perhaps more common, it suffices to allege that the agency violated a specific statute or regulation creating an exception to CICA's competition requirement, when the absence of regulatory compliance means that the procurement had to be fully competed.[11]  *RhinoCorps*, 87 Fed. Cl. at 490; *see also Savantage Fin. Servs.*, 81 Fed. Cl. at 305; *CCL, Inc.*, 39 Fed. Cl. at 789.

Because this court possesses jurisdiction to hear claims that the Government "is procuring

_____

[10] FAR § 19.502-2, entitled "Total small business set-asides" reserves, with exceptions, certain acquisitions for small businesses if the agency finds that "(1) offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns . . . ; and (2) award will be made at fair market prices."  *Id.* § 19.502-2(b).  This section therefore permits (and requires) the agency to limit competition to small businesses under specific circumstances.  *See Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 445 (2009).  Whether the agency has rationally justified its decision to limit competition to small businesses is protestable under the third category of the court's bid protest jurisdiction. *RhinoCorps*, 87 Fed. Cl. at 489.

[11] Defendants argue the merits of whether the removal of the NTEs was a cardinal change.  Def.'s Supp. Br. at 6; Luke's Supp. Br. at 3.  Plaintiffs do not allege that the removals were a cardinal change.  Magnum's Supp. Br. at 1; Healing Staff's Supp. Br. at 2.  The only issue before the Court is whether the exercise of the options of four awardees complied with applicable laws and regulations.

goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law," *CCL, Inc.*, 39 Fed. Cl. at 788 (emphasis omitted), defendants' motions to dismiss for lack of jurisdiction must be **DENIED**.

### B. Plaintiffs Possess Standing to Pursue Their Bid Protests

To invoke this court's jurisdiction, plaintiffs "bear[] the burden of showing that [they have] standing for each type of relief sought." *Summers v. Earth Island Inst.*, 129 S.Ct. 1142, 1149 (2009). To demonstrate Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000). In this court, plaintiffs face the further hurdle of establishing statutory standing. Congress permits this court to hear only cases brought by "an interested party" objecting to a federal procurement or proposed procurement. 28 U.S.C. § 1491(b)(1); *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("*AFL-CIO*") (holding that "interested party" under the Tucker Act is to be construed in accordance with the same language as used in CICA, 31 U.S.C. § 3551(2)).

Defendants argue that (1) Magnum Opus lacks standing to pursue its claim because it is only half of the joint venture that was awarded an ID/IQ contract, Def.'s Mot. at 10-13; (2) both plaintiffs have failed to meet their burden to demonstrate prejudice as part of the standing analysis, Defendant's Response to Motion to Supplement ("Def.'s Resp.") (docket entry 63, April 5, 2010) ; Luke's Reply at 18; and (3) plaintiffs have not alleged sufficiently particularized harm to demonstrate prejudice, Def.'s Reply at 55-59.

### 1. Magnum Opus May Proceed Without Its Co-Venturer

The Government asserts that Magnum Opus lacks standing to bring this lawsuit, whether or not it is properly construed as a bid protest, because Magnum Opus is merely one of the joint venturers in Magnum Medical. Def.'s Mot. at 10. Because Magnum Opus did not receive an ID/IQ contract, defendant asserts that it "would not have standing on [its] own to bid or receive a contract award," and thus is not an "interested party" within the meaning of the Tucker Act. *Id.* at 12. More precisely, the Government argues that "the agency cannot exercise an option to include one party to a joint venture but not another." *Id.* at 12 n.8; *id.* at 13 ("Because Magnum [Opus] was not the party whose bid was rejected and because the option cannot be extended solely to Magnum [Opus] without its joint venture partner, it does not have standing to bring this bid protest.").

If this were a suit to enforce a right belonging to the joint venture (*e.g.*, a purported right to have its option exercised), the Government's position would be correct. *Pine Prods. Corp. v. United States*, 15 Cl. Ct. 11, 14 (1988) ("[T]he universal rule is that an individual co-venturer may not sue in his own name to enforce a liability owed to the joint venture."). As discussed

above, however, Magnum Opus counters that it is not, in fact, suing upon the joint venture's rights, but rather upon its own rights as a prospective bidder in a new competition for the health services contracts. Magnum's Mem. at 16. That is, Magnum Opus maintains that these contracts must be re-solicited, and Magnum Opus is eligible to compete in that re-solicitation; thus, it is a "prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* at 16 (quoting 35 U.S.C. § 3551(2)(A)). Accordingly, the argument that Magnum Opus cannot proceed without its co-venturer is unavailing.

2. <u>Magnum Opus Has Demonstrated Both Standing and Prejudice By Showing a Non-Trivial Competitive Injury</u>

Standing to bring a bid protest under the Tucker Act, as amended by the Alternate Dispute Resolution Act, is limited to "interested parties," namely, "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *AFL-CIO*, 258 F.3d at 1302. This statutory definition necessitates a two-part showing to establish standing: (1) plaintiff must establish that it is an actual or prospective bidder, and (2) plaintiff must demonstrate that it possesses a direct economic interest. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *Totolo/King v. United States*, 87 Fed. Cl. 680, 688 (2009) (concluding pre-award protestor possessed standing because it was "a prospective bidder if the Solicitation were issued as a SDVOSB or small business set-aside, and because plaintiff's direct economic interest has been affected by the DVA's decision to conduct the Solicitation as full and open competition/unrestricted").

Taking the second requirement first, a showing of "direct economic interest" requires the plaintiff to demonstrate that "any alleged errors caused prejudice." *Global Computer Enters.*, 88 Fed. Cl. at 401; *see Galen Med. Assocs. Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004). In the post-award context, this requirement sometimes causes confusion, because the court also considers prejudice to the protestor in determining whether the protestor has met the criteria to prevail on the merits. In post-award bid protests, the court "looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief."[12] *A & D Fire Prot. Inc. v. United States*,

---

[12] Standing is a jurisdictional requirement, so a plaintiff's failure to establish standing "precludes a ruling on the merits." *Media Techs. Licensing, LLC v. Upper Deck Co.,* 334 F.3d 1366, 1370 (Fed. Cir. 2003). The corollary to this principle is that the Government cannot require a plaintiff to prove the merits of its case in order to demonstrate standing. Thus, it is a "circular argument" to state that a plaintiff who is challenging a non-responsibility finding that must show its responsibility before it possesses standing to challenge the agency's conclusion it is not responsible. *Tip Top Constr. Co. v. United States*, No. 08-352, 2008 WL 3153607, at *11 (Fed. Cl. Aug. 1, 2008); *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 469 (2008).

Some portion of the conceptual confusion arises because "[a] determination even at the

72 Fed. Cl. 126, 131 n.4 (2006); *see also Serco, Inc. v. United States*, 81 Fed. Cl. 463, 482 n.25 (2008). The second, more searching prejudice inquiry relating to the merits requires assessing whether the plaintiff has established a "substantial chance" it would have received the contract, *Rex Serv. Corp.*, 448 F.3d at 1308, after "review of the contract award or bid evaluation process to determine what might have occurred if the government had not erred." *Weeks Marine Inc. v. United States*, 79 Fed. Cl. 22, 35 (2007), *aff'd in relevant part*, 575 F.3d 1352 (Fed. Cir. 2009) (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 n.9 (1998)).

But when plaintiff either challenges a solicitation prior to award or protests an alleged illegality with respect to a "proposed procurement," there is ordinarily "no factual foundation for a 'but for' prejudice analysis"—the court cannot, therefore, assess whether "but for" a Government error, the plaintiff had a substantial chance of receiving a contract in assessing whether plaintiff possessed a "direct economic interest."[13] *Weeks Marine*, 575 F.3d at 1361. The

_____

end of trial that the court is not prepared to award any remedy may be expressed as a conclusion that the plaintiff lacks standing." 13A Charles A. Wright et al., Federal Practice & Procedure § 3531.6 (3d ed. rev. 2010). Because such a finding necessitates a full airing of the case, however, this inquiry cannot be the same as the one the Federal Circuit requires the court to undertake regarding prejudice with respect to standing, which the Court must reach "before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In a post-award bid protest, before reaching the merits of the parties' dispute, the court conducts only a "limited review" of the plaintiff's allegations and the administrative record for the "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing." *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005); *see also McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007). This threshold determination of standing should "require[] only that a protestor be (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations." *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 285 (2006); *see also Global Comp. Enters.*, 88 Fed. Cl. at 401. This approach "avoid[s] examining the parties' arguments on the merits in order to resolve standing." *Textron*, 74 Fed. Cl. at 285.

[13] Occasionally pre-award cases arise in which proposals have been submitted and evaluated such that the competition can be assessed using a more stringent prejudice standard. *See, e.g.*, *Med. Dev. Int'l Inc. v. United States*, 89 Fed. Cl. 691, 701 (2009) ("[B]ecause this post-competitive range challenge to the competitive range determination is sufficiently analogous to a post-award challenge to award, the 'substantial chance' test is the appropriate standard under which to evaluate plaintiff's claim."); *see also DMS All Star Joint Venture*, 90 Fed. Cl. at 661 & n.10 (protest after evaluation of proposals).

appropriate inquiry in such a protest is whether the plaintiff has demonstrated a "non-trivial competitive injury which can be redressed by judicial relief." *Id.* at 1362 (concluding this standard applies to standing inquiries with respect to a bid protest alleging "any alleged violation of statute or regulation in connection with . . . a proposed procurement"). Therefore, such a plaintiff possesses standing where it "established an interest in bidding" and "ha[d] a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Id.* Given the nature of a protest brought prior to the award of a contract or issuance of a solicitation, there is no meaningful way to further assess the prejudice to the plaintiff after examination of the merits—if the failure to hold a competition was wrongful or there was a material error in the solicitation, then the plaintiff has been wrongfully deprived of the opportunity to fully and fairly compete, which suffices to establish prejudicial injury on the merits. *See Distributed Solutions*, 539 F.3d at 1345 ("The contractors also possess a direct economic interest in the government action at issue in that they were . . . deprived of the opportunity to compete for the provision of [the services].").

Magnum Opus has established that it is interested in bidding, has asserted its ability to perform a contract, and "has a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Weeks Marine*, 575 F.3d at 1362. If Magnum Opus succeeds in this protest, then it will be able to compete in any re-solicitation for the services it alleges should have been subject to competition; if it does not succeed, then it is foreclosed from even offering to provide those services for at least three years. *Friends of the Earth*, 528 U.S. at 181 (holding that a linchpin of standing is a finding that a remedy will redress the plaintiff's injury); *N.E. Fl. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (concluding standing is established by the inability to compete on an equal footing in the bidding process, "not the ultimate inability to obtain the benefit").

The Government contests Magnum Opus's ability to meet the first requirement of the standing inquiry, *i.e.*, that Magnum Opus is a "prospective bidder." *Weeks Marine*, 575 F.2d at 1360. Defendant argues that Magnum Opus's evidence "does not support Magnum's argument that it is qualified to bid on large-scale Government contracts that require the capability to perform on a national basis." Def.'s Resp. at 3. That is, defendant contends that although Magnum Opus was a partial holder of an ID/IQ contract during the base period, Magnum Opus alone, without Sterling Medical, is not a "qualified bidder" with standing to bring this bid protest. This case is therefore somewhat different from *Weeks Marine*, where the Government conceded the plaintiff's financial wherewithal and technical ability to perform the work if awarded.

The Government relies upon *Myers Investigative & Security Services*, 275 F.3d at 1369, where the plaintiff pled only that if the Government had competed the procurement, it would have submitted a bid, but "made no effort to show that it was responsible and could have performed the contract" even after defendant contested standing. Although plaintiff only had to "establish that it could compete for the contract if the bid process were made competitive," the Federal Circuit concluded that "[t]he mere fact that it might have submitted a bid in a competitive procurement is not sufficient." *Id.* at 1370 (internal quotations omitted). The

plaintiff also needed to allege—and show, if challenged—that it was a "qualified bidder." Because *Myers* was a post-award protest, the plaintiff had to show that it was sufficiently qualified to possess a "substantial chance" of receiving an award.

In this case, however, there is neither an award nor a solicitation setting forth the terms of the competition. Magnum Opus stated at oral argument that the reason it sued without its joint venture partner was that the mentor/protégé agreement between Sterling Medical and Magnum Opus had expired, and thus the joint venture could no longer be classified as a "small business" under SBA regulations. Oral Arg. Tr. at 13-14. The original contract was set aside for small businesses. If it were re-competed, the contract might again be set aside for small businesses; if that were so, the joint venture would not be eligible to compete in any re-solicitation of the work. At a hearing, however, the Deputy Director of the Air Force Medical Service Commodity Council, Joseph Mirrow, testified that he was "not necessarily convinced" the contract should be a small business set-aside if it were subjected to re-competition. April 22, 2010 Evidentiary Hearing Transcript at 77 ("Evid. Hearing Tr.") (docket entry 84, filed April 23, 2010). If that were the case, then Magnum Medical would be eligible to compete notwithstanding the expiration of the mentor/protégé agreement. Moreover, Magnum Opus argues that it "has a long history of providing health care personnel to the Federal Government," Magnum Opus's Supplemental Brief Regarding Standing at 2 ("Magnum Opus's Supp. Standing Br.") (docket entry 59, March 29, 2010), and that because Magnum Opus is in the business of staffing medical service providers, it is a qualified competitor. Oral Arg. Tr. at 13. Magnum Opus's position is that it has "the requisite experience to bid on this type of work." *Id.* at 15. That is, there is "greater than an insubstantial chance" that Magnum Opus, with or without a partner, could secure a contract in a re-competition. *Info. Tech.*, 316 F.3d at 1319.

In the absence of any solicitation setting forth the requirements for a "qualified bidder," it is difficult for the Court to conclude as a legal matter that Magnum Opus is not qualified. Most decisions finding a bidder not qualified involve an existing legal impediment.[14] For example, if the plaintiff's bid expired prior to award, it lacks standing. *Camden Shipping Corp. v. United States*, 89 Fed. Cl. 433, 439 (2009). If the SBA already found the protestor to be "other than small," the protestor lacks standing if any small business has submitted a proposal, because the protestor has no chance of receiving a contract. *See, e.g.*, *Taylor Consultants, Inc. v. United*

---

[14] Some earlier pre-award protest decisions focus on the subject matter of the protest. For example, in *L-3 Communications EOTech,*, 85 Fed. Cl. at 672-73, the plaintiff possessed standing, notwithstanding a failure to manufacture the solicited product, because the plaintiff was challenging the Government's failure to consider the product plaintiff did manufacture. Likewise, if a plaintiff challenged the Government's withholding of the technical data that would allow plaintiff to manufacture the solicited product, the plaintiff would have standing even though at the time of the protest it could not manufacture that product. *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 248 (2006); *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 247 (1999). Although these opinions dealt with pre-award protests, they were decided pre-*Weeks Marine* and therefore analyzed standing under the "substantial chance" framework.

*States*, 90 Fed. Cl. 531, 541-43 (2009); *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 6-7 (2008); *Pride Int'l LLC v. United States*, 64 Fed. Cl. 754, 757 n.6 (2005); *see also Labatt Food Serv. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009) ("*Labatt*") (actual bidder lacked standing because alleged error was not the cause of its failure to receive award); *N.C. Div. of Servs. for Blind v. United States*, 53 Fed. Cl. 147, 162 (2002) (finding no standing where plaintiff "as the blind licensee, would be the contract manager . . . but certainly not a bidder or offeror").

Magnum Opus has shown that it engages in the type of business that is the subject of the contract, has in fact successfully performed such contracts in the past, and has represented that it could find another teaming partner in the event it submitted an offer in a re-competition if the contract were of a similar size to the expired ID/IQ contracts.[15]  The Court therefore concludes that Magnum Opus has shown a non-trivial competitive injury, *i.e.* sufficient prejudice to provide it with standing and to entitle it to relief upon the merits if the Court finds legal error.  Given that these allegations overlap substantially with those made by Healing Staff, the finding may be without much practical import, in the sense that even if the Court had concluded that Magnum Opus lacked standing, the litigation would nonetheless proceed with Healing Staff as the sole plaintiff.  No party contests Healing Staff's status as a "qualified bidder" with standing to pursue its own complaint.  *See, e.g.*, Oral Arg. Tr. at 38; *Mgmt. Solutions & Sys. v. United States*, 75 Fed. Cl. 820, 826 (2007) (holding that a contractor had standing as a qualified bidder "because it had performed these services in the past").

### 3.   Plaintiffs Have Sufficiently Alleged Particularized and Prejudicial Harm

Defendants also argue, relying primarily on the Federal Circuit's recent decision in *Labatt*, that plaintiffs have failed to demonstrate they suffered "disparate treatment or

---

[15]  In its complaint, Magnum Opus noted that Magnum Medical was awarded [***] task orders valued at [***].  Magnum Opus Compl. ¶ 48.  Magnum Opus itself performed [***] of this work, and was scheduled to perform [***] of the [***] in option work on those task orders. *Id.* ¶¶ 49-52.  Sterling Medical performed approximately [***] of the work under the Magnum Medical Joint Venture contract, while Magnum Opus performed approximately [***] percent. Magnum Opus further submitted the affidavit of its president and chief executive officer, Robert T. Manigault, to the effect that in 2009, Magnum Opus generated [***] in sales, of which [***] came from healthcare staffing.  Robert T. Manigault Affidavit at ¶ 3 ("Manigault Aff.") (March 20, 2010), *attached as* Ex. 1 to Magnum Opus's Motion to Supplement the Record (docket entry 59, March 23, 2010).  Mr. Manigault lists a substantial number of contracts and task orders issued to Magnum Opus, along with types of health care positions that Magnum Opus has filled. *See* Manigault Aff., Ex. A.  Magnum Opus's prior experience seems at first glance to be of limited significance in relation to the size and scope of the ID/IQ contract in this case.  However, Magnum Opus has made an adequate showing on the record that it could compete as a qualified bidder in a re-competition, possibly with a new teaming partner.

particularized harm" and thus lack standing.[16]  Def.'s Reply at 56, quoting *Labatt*, 577 F.3d at 1380; *see also Galen Med. Assocs.,* 369 F.3d at 1331.

In *Labatt*, the Federal Circuit found that where the agency mistakenly accepted bid revisions via e-mail rather than by fax as required by the solicitation there was no prejudice to offerors.  *Labatt*, 577 F.3d at 1380.  The Federal Circuit held that the plaintiff did not possess standing because the "improper deviation from the solicitation . . . equally permitted all offerors to submit proposal revisions via email, harming none."  *Id.*  According to defendant, the agency's removal of the NTE pricing "affected—indeed *benefitted*—everyone equally" and therefore did not result in "particularized harm" to plaintiffs.  Def.'s Reply at 58; *see* Oral Arg. Tr. at 58 ("Magnum and THS were treated the exact same way as the other four contract holders, and there is no way to show that they were specifically harmed by the purported violation of the FAR, which was not intended for their benefit anyway.").

But the error alleged by plaintiffs is not the deletion of the NTE prices.  Rather, as discussed above, it is the exercise of options in violation of applicable procurement laws and regulations.  Plaintiffs allege such violations require re-competition for the option period; that is, the alleged error is that the agency procured services illegally by exercising the options.  The particularized harm to plaintiffs is that the four contractors who received the benefit of the options did so without undergoing legally required competition, while plaintiffs were deprived of the opportunity to compete for the work to be performed in the option years.  A deprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing.  *See Distributed Solutions*, 539 F.3d at 1345; *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 575-76 (2005).

Plaintiffs therefore possess standing to pursue this protest, and defendants' motions to dismiss their complaints on standing grounds must be **DENIED**.

## III.   Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted

Defendants also move pursuant to RCFC 12(b)(6) to dismiss plaintiffs' complaints for failure to state a claim upon which relief can be granted.  First, defendants raise a series of arguments contending that plaintiffs have waived their right to protest the option exercise.  Second, defendants argue that certain Federal Circuit case law establishes that FAR § 17-207(f) does not create a right in plaintiffs' favor.

The court will dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) if "the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the

---

[16] Defendants characterize this argument as one regarding prejudice on the merits. *Labatt*, however, analyzes prejudice as it relates to standing.  The Court therefore construes this argument to contest plaintiffs' standing to bring this action.

complainant." *Levine v. United States*, 453 F.3d 1348, 1350 (Fed. Cir. 2006). If the facts alleged reveal any possible basis on which the plaintiff might prevail, the court must deny the motion. *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). Plaintiff must, however, do more than recite the elements of a cause of action; it must make sufficient factual allegations to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also St. Bernard's Parish v. United States*, 88 Fed. Cl. 528, 556 (2009).

### A.   *Plaintiffs Have Not Waived Their Right To Protest the Exercise of the Options*

Relying upon *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), defendants contend that plaintiffs have failed to state a claim upon which relief can be granted because they waived their right to challenge the exercise of the options by failing to raise their objections at an earlier time.

First, defendants argue that plaintiffs have waived their ability to object to the exercise of the options because during the bidding period for the ID/IQ contracts, plaintiffs were aware that the contacts did not include pricing for all positions that the awardees would potentially be required to provide under the contracts. Def.'s Reply at 44; Oral Arg. Tr. at 40. In fact, the Air Force issued task orders for 52 positions for which no price was evaluated or requested as part of the base ID/IQ contracts. Oral Arg. Tr. at 40. Therefore, defendants argue that pricing was always "notional," and plaintiffs were required to protest the structure of the pricing prior to the close of bidding for the ID/IQ contract.[17] *Id.*

Defendants' argument erroneously equates two different situations. In the first, prices for several positions that could potentially be filled under an ID/IQ contract in the future are undefined at the time of award. In the second, prices for the majority of positions that were certain to be filled under the contract are evaluated at the time of award, and subsequently deleted prior to the exercise of contract options. In the context of an ID/IQ contract, the former is not necessarily objectionable. As Professors Nash and Cibinic observe, it can be difficult for the

---

[17]   The Court's attempt to determine why the Air Force finds the phrase "notional" pricing comforting has come to naught. The only approval of "notional" values the Court has been able to locate relates to the permissibility of hypothetical task orders as a reasonable method of determining price for ID/IQ contracts. These hypothetical task orders were sometimes called "notional" shipments. *See, e.g., Aalco Forwarding, Inc.*, B-277241, 98-1 CPD ¶ 87, 1998 WL 121352, at *7 (Comp. Gen. March 11, 1998) (approving "notional shipment" as a "reasonable basis for evaluating or comparing the relative costs of proposals" where the "agency lacks historical data to project estimates").

Government to evaluate price or cost where the quantity of work may not be known until task orders are issued.  Ralph C. Nash, *Evaluating Price or Cost in Task Order Contracts*, 19 No. 11 Nash & Cibinic Report ¶ 52 (Nov. 2005); Ralph C. Nash & John Cibinic, *Evaluating Cost to the Government When Quantities Are Unknown*, 14 No. 2 Nash & Cibinic Report ¶ 10 (Feb. 2000).  In such circumstances, the GAO has recognized the legitimacy of methods of evaluating and comparing the relative cost or price of task orders that do not necessarily take into account the price of every individual category of goods or services that could potentially be ordered under the contract, such as pricing sample task orders.  *See S.J. Thomas Co.,* B-283192, 99-2 CPD ¶ 73, 1999 WL 961750, at *4 (Comp. Gen. Oct. 20, 1999) ("If used intelligently, sample tasks can provide insight into competing offerors' technical and staffing approach and thus provide a reasonable basis to assess the relative cost of the competing proposals."); *Aalco Forwarding, Inc.*, B-277241, 98-1 CPD ¶ 87, 1998 WL 121352, at *7 (Comp. Gen. March 11, 1998) ("Where estimates for various types of required services are not reasonably available, an agency may establish a reasonable hypothetical, consistent with the RFP requirements, to provide a common basis for comparing the relative costs of the proposals."); *High-Point Schaer*, B-242616, 91-1 CPD ¶ 509, 1991 WL 119136, at *5 (Comp. Gen. May 28, 1991) (approving evaluation of total cost of an ID/IQ contract based upon a sample task order where labor categories and estimated hours of work are unknown); *see also Envtl. Sci. & Eng'g, Inc.*, B-253208, 1993 WL 335053, at *5 (Comp. Gen. Aug. 25, 1993) (holding that it was sufficient to compare labor rates for key personnel only in a labor-hour contract).

However, as discussed *infra* at Section IV, while there is flexibility in price evaluation for ID/IQ contracts, there must be *some* binding price that can be evaluated for purposes of a meaningful comparison of the offerors' proposals.  In the present case, the alleged error only occurred after the NTEs were made non-binding and thus all previously evaluated price ceilings were removed from the contracts.  Moreover, the harm allegedly suffered by plaintiffs only occurred once the options of the other ID/IQ contract holders were exercised after the deletion of the NTE prices.  Therefore, the fact that the RFP always contemplated that some positions not priced in the ID/IQ contracts could be filled under the contracts does not mean that plaintiffs have waived their ability to protest the exercise of options after the only prices evaluated at the time of award were made entirely non-binding.

Next, defendants argue that under *Blue & Gold*, plaintiffs have waived their ability to protest the exercise of the options by failing to timely object to the October 2008 contract modifications deleting the NTE pricing.  *See* Def.'s Mot. at 15 n.9; Luke's Mot. at 6-7.  They argue that if the removal of the NTE pricing made it impossible to consider price in exercising options, then the removal of the NTE rate caps should have made price reasonableness impossible to determine at the task order level under the base ID/IQ contract as well.  Luke's Reply at 22; Oral Arg. Tr. at 70.  Because plaintiffs "continued to happily perform" under the ID/IQ contract for a year after the removal of the NTE pricing, defendants contend that plaintiffs "missed their chance" to argue that the exercise of the options violated FAR § 17.207(f).  Oral Arg. Tr. at 71.

The facts of this case simply do not implicate the waiver doctrine set forth in *Blue &*

*Gold*.  In *Blue & Gold*, the Federal Circuit held that a party that has the opportunity to object to the terms of a solicitation containing a patent error but fails to do so prior to the close of the bidding process waives its ability to raise the objection in a subsequent bid protest.  *Blue & Gold,* 492 F.3d at 1314.  In the present cases, there was no bidding process for the option work at issue—in fact, the gravamen of plaintiffs' complaints is that the work was *not* procured competitively.  *See* Magnum Opus Compl. ¶¶ 86-115; Healing Staff Compl. ¶¶ 39-43.  Indeed, it is difficult to determine at what juncture defendants contend plaintiffs would have had to raise their objections in order to comply with *Blue & Gold*, since "bidding" never commenced with respect to the exercise of the options and therefore could not "close."  Although plaintiffs were aware that the NTE pricing had been deleted from their contracts nearly a year before the options of the other ID/IQ contract holders were exercised, plaintiffs do not complain of the elimination of the NTE rates, but rather of the later exercise of the options in violation of FAR § 17.207(f).  For these reasons, the Court finds that plaintiffs did not waive their ability to bring these protests by failing to object to the contract modifications deleting the NTE pricing at some earlier time.

Defendant alternatively argues that plaintiffs have waived their right to challenge the exercise of the options because they "should have raised their concerns with the proposed terms of the Government's ability to exercise discretionary three-year option periods when the Air Force issued the RFP in May 2005."  Def.'s Mot. at 15.  Once again, defendant's argument disregards the fact that the circumstances that plaintiffs find objectionable—the exercise of options after the NTE pricing was deleted from the original ID/IQ contracts—did not occur until long after the bidding process for the original ID/IQ contract had closed.  More importantly, the Court is unpersuaded that plaintiffs could waive their right to challenge the illegal exercise of options by failing to object to provisions in the RFP stating that the Government was entitled to exercise the options at its discretion.  Such a waiver would require the RFP to allow the Government discretion to illegally exercise the options, which is clearly not the case.  *Magic Brite*, 72 Fed. Cl. at 721 ("When the government holds an option it may employ whatever *lawful* criteria it chooses when deciding whether to exercise it or not.") (emphasis added).  The Court declines to adopt such a plainly unreasonable construction of the RFP.  *See Nw. Marine Iron Works v. United States*, 493 F.2d 652, 657 (Ct. Cl. 1974) ("Construction of the terms of a contract, like construction of a statute, should avoid absurd and whimsical results.") (internal quotations omitted).[18]

---

[18]  Luke also argues that plaintiffs are barred from bringing their claims by the doctrines of laches and estoppel because they waited more than a year from the time that the NTE pricing provisions were deleted from their contracts before asserting a claim.  Luke's Mot. at 6-7.  To establish the affirmative defense of laches, a party must show unreasonable and inexcusable delay from the time the claimant knew or reasonably should have known of its claim against the party, and that the delay caused either economic prejudice, or injury to the party's ability to mount a defense.  *CW Gov't Travel v. United States*, 61 Fed. Cl. 559, 568-69 (2004).  The elements of equitable estoppel are "(1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material

B.   *FAR § 17.207 Confers A Cause Of Action Upon Potential Competitors*

Defendants also argue that plaintiffs' protests must be dismissed pursuant to RCFC 12(b)(6) because in *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000), the Federal Circuit determined that FAR § 17.207 is a regulation for the benefit of the Government that does not confer a private right of action upon contractors.  Def.'s Mot. at 17-18; Luke's Reply at 18-21.

In *Freightliner*, a contractor whose option had been exercised brought a CDA claim seeking additional payment for performing the option work on the theory that the option had not been validly exercised because the Government had failed to comply with FAR § 17.207(f).  *Freightliner*, 225 F.3d at 1364.  In that context, the Federal Circuit found that "even if [the agency] failed to comply with FAR § 17.207(f), it would not render the [option exercise] ineffective because FAR § 17.207(f) did "not exist for the benefit of the contractor."  *Id.* at 1365.  That is, FAR § 17.207(f) does not exist for the benefit of a contractor whose option has already been exercised seeking an equitable adjustment for performing the option work.  Instead, the Federal Circuit held that "FAR § 17.207(f) exists to ensure that the contracting officer acts in the best interest of the government."  *Id.* at 1365.

*Freightliner* does not govern the present case because plaintiffs are not bringing their claims as contractors.  Instead, they bring their claims as potential competitors, alleging that the Air Force's violation of FAR § 17.207(f) and CICA requires a new procurement in lieu of exercising the options of the other four ID/IQ contract holders.  *See, e.g., Myers*, 275 F.3d at 1369-70 (recognizing that an interested party in a bid protest is a party that was injured as a competitor or potential competitor).  Thus, while *Freightliner* would, for example, prohibit Luke or TerraHealth from relying on FAR § 17.207(f) in a later CDA action seeking an equitable adjustment for performing work during the option period, it does not necessarily preclude potential competitors like Magnum Opus and Healing Staff from bringing a bid protest challenging an alleged violation of the competition requirements in FAR § 17.207.

The Federal Circuit's finding that FAR § 17.207(f) exists for the benefit of the Government as opposed to a contractor seeking an equitable adjustment does not mean that the regulation exists for the benefit of the Government to the exclusion of all other potential parties.  Certainly it is possible for a regulation to exist both for the benefit of the Government and for

---

prejudice if the delayed assertion of such rights is permitted." *Lincoln Logs, Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992).

Luke has neither established nor attempted to establish the prejudice element of either doctrine.  Plaintiffs' failure to object to the modifications deleting the NTE pricing at a time when it was unclear whether any options would be exercised should not have led the Government to infer that plaintiffs would not assert their rights if options were illegally exercised in the future.  Therefore, plaintiffs' protests are not barred by either doctrine.

potential competitors in different contexts.  For example, in *D.V. Gonzalez Electric & General Contractors, Inc. v. United States*, 55 Fed. Cl. 447, 454 (2003), this court held that a contractor could not bring a CDA claim alleging a violation of a Department of Veterans Affairs regulation analogous to FAR § 19.806(b), because the regulation existed for the benefit of the Government, as opposed to the contractor.  However, in *Techno-Sciences, Inc.*, B-277260, 97-2 CPD ¶ 115, 1997 WL 666979, at *3-5 (Comp. Gen. Sept. 22, 1997), the GAO sustained a bid protest brought by a competitor alleging a violation of FAR § 19.806(b).  In *Freightliner*, the Federal Circuit held that FAR § 17.207(f) did not provide a cause of action for a contractor bringing a CDA claim seeking additional payment for the work covered by the option because the regulation existed for the benefit of the Government, as opposed to the contractor.  *Freightliner*, 225 F.3d at 1365.  But in *Phoenix Air Group*, this court entertained a bid protest upon the merits in which a competitor sought to set aside a contract award based upon allegations that the Government violated FAR § 17.207(f).[19]  *Phoenix Air Group*, 46 Fed. Cl. at 107.  It is only logical that a regulation such as § 17.207(f), which mandates that the requirements of full and open competition be met unless certain criteria are satisfied, could serve to benefit both the Government, which seeks to obtain the best valued goods and services, and potential competitors, who seek to be selected by the Government as providing the best value in goods and services.  *See* FAR § 17.207(f); *see also Major Contracting Servs., Inc.*, 2009 WL 2933344, at *5.

The history surrounding the enactment of FAR § 17.207(f) further suggests that the purpose of its enactment was to ensure price competition and therefore, the regulation should be the basis for a valid CICA claim.  In the 1980s, the GAO expressed concern over defense agencies' use of unpriced options on "umbrella" contracts to procure services.  Letter from Frank C. Conahan, Director, National Security and International Affairs Division, General Accounting Office to Hon. Caspar W. Weinberger, Secretary of Defense, B-217655, 1986 WL 312402, at *1-2 (Comp. Gen. Apr. 23, 1986) ("Weinberger Report"); *see also* Vernon J. Edwards, *Postscript: Options for Additional Years of Work*, 23 No. 4 Nash & Cibinic Report ¶ 21 (Apr. 2009).  That is, in exercising the option, the agency left the price open to future negotiation instead of accepting a specific price offered in the original contract.  Weinberger Report, 1986 WL 312402, at *1.  This practice led to later disputes over the proper pricing of the option services.  *See, e.g.*, *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1570 (Fed. Cir. 1991).

In a series of decisions, the GAO found these unpriced options to be improper.  *See*

---

[19]   Although *Phoenix Air Group* was decided a few months prior to *Freightliner*, the Federal Circuit did not discuss the *Phoenix Air Group* decision in *Freightliner*.  *See Freightliner*, 225 F.3d 1361.  To the extent that defendants contend that the Federal Circuit intended to overrule *Phoenix Air*, the Court declines to adopt such a finding, as courts will generally not "overturn, or so dramatically limit, earlier authority *sub silentio*."  *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000); *see also Peeke v. Penn Cent. Transp. Co.*, 403 F. Supp. 70, 74 (E.D. Pa. 1975) ("[T]he purpose of a court to overrule prior authority is not lightly to be presumed, especially an overruling *sub silentio*.").

*Varian Assocs., Inc.*, B-208281, 83-1 CPD ¶ 160, 1983 WL 26465, at *3 (Comp. Gen. Feb. 16, 1983); *Dep't of Health & Human Servs.—Reconsideration*, 81-2 CPD ¶ 279, B-198911.3, 1981 WL 23275, at *2 (Comp. Gen. Oct. 6, 1981); *see also Amdahl Corp.*, B-198911, 81-1 CPD ¶ 231, 1981 WL 24233, at *4 (Comp. Gen. March 27, 1981); *Pacificon Prods. Inc.*, B-196371, 80-2 CPD ¶ 58, 1980 WL 16248 (Comp. Gen. July 22, 1980). The GAO found that accepting an unpriced option "constitutes a resolicitation of the contract on a noncompetitive basis." Weinberger Report, 1986 WL 312402, at *9. Unless the agency issued an appropriate sole-source selection finding, *see, e.g., Kollsman Instrument Co.*, B-233759, 89-1 CPD ¶ 243, 1989 WL 237450, at *3 (Comp. Gen. March 6, 1989); *Pacificon Prods.*, 1980 WL 16248, at *3-4, exercising the option was an impermissible *de facto* sole source procurement. Weinberger Report, 1986 WL 312402, at *9.

The GAO ultimately recommended that the FAR be revised "to help ensure that future option provisions are priced." Weinberger Report, 1986 WL 312402, at *13. As a result, FAR § 17.207(f) clarified that a proper option must include a price term that is "specified in or reasonably determinable from the terms of the basic contract." FAR § 17.207(f); *see* Federal Acquisition Regulation (FAR); Options, 51 Fed. Reg. 39,456, 39,456-57 (Oct. 28, 1986); Vernon J. Edwards, *Postscript: Options for Additional Years of Work*, 23 No. 4 Nash & Cibinic Report ¶ 21 (Apr. 2009). FAR § 17.207(f) thus both preserves the right to competition at the conclusion of a base contract and protects the government from potentially unlimited costs resulting from exercising an unpriced option. *See Freightliner*, 225 F.3d at 1365 ("FAR § 17.207(f) exists to ensure that the contracting officer acts in the best interest of the government.").

To read *Freightliner* as precluding a bid protest challenge of this sort would render meaningless the provision in FAR § 17.207(f) requiring that agencies "satisfy the requirements of [FAR] part 6 regarding full and open competition" and the Tucker Act's grant of jurisdiction to hear objections to "any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Government concedes that the Air Force was bound by § 17.207(f) in this procurement, Oral Arg. Tr. at 41, and plaintiffs contend that regulation was violated. There are certainly some instances where an alleged violation of a regulation does not create an enforceable right for disappointed bidders. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996); *Keco Indus., Inc.*, 492 F.2d 1200, 1206 (Ct. Cl. 1974). However, for the reasons discussed above, the Court finds that plaintiffs' claims that the option work was improperly awarded without the requisite competition as a result of an alleged violation of § 17.207(f) do not fall within that category. The Court therefore concludes that FAR § 17.207(f) creates a cause of action for potential competitors such as plaintiffs.

For these reasons, defendants' motions to dismiss for failure to state a claim upon which relief can be granted are **DENIED**.

**IV.     Defendant Failed to Comply with FAR § 17.207(f) in Exercising the ID/IQ Options**

Turning to the merits, the parties have cross-moved for judgment upon the administrative record pursuant to RCFC 52.1.  In a manner "akin to an expedited trial on the paper record," the court will make findings of fact where necessary to resolve these motions.  *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007).  The Court will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  In a bid protest, the protestor will succeed when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  To show a violation of procurement regulation or procedure, the protestor bears a heavy burden and must show a "clear and prejudicial violation of applicable statutes or regulations."  *Id.*

The most significant alleged regulatory violation in this case is of FAR § 17.207(f).  That provision mandates that for the Government to validly exercise an option, "the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract."  *Id.*

> A.     *Defendant Cannot Satisfy FAR § 17.207(f) By Relying On the Price Analysis Done At the Time of Award*

At the time of the initial award of these ID/IQ contracts, the Government evaluated the price of offerors' proposals by "adding the total price of all Section B positions at all locations for each year of the base period, Option 1 and Option 2."  AR Tab 1 at 196.  That is, the offerors proposed a base rate and an escalation rate that increased that base rate throughout the potential ten-year term of the contract.  In awarding the contract, the Air Force considered this proposed pricing, including the option periods, for the positions contained in the upper half of Table 1 in calculating the total evaluated price for the proposal.[20]  Def.'s Reply at 6; AR Tab 1 at 196; *see also* Carl L. Vacketta & Gail D. Frulla, *"Option" Clauses*, 88-13 Briefing Papers 1 (Dec. 1988) (noting that options can be priced by modifying the contract unit price with an escalation rate).

The Government contends that "[t]he exercise of the option didn't change the validity of the initial reasonableness analysis," Oral Arg. Tr. at 55, but the Court cannot agree.  After the contract modifications rendered the NTE rates in Table 1 non-binding, the price evaluation conducted at the time of the initial award was no longer useful.  At the time the options were exercised, the NTE rates were only advisory, and the contractors could increase their labor rates

---

[20]  The Air Force did not consider NTE rates for the non-common positions in the lower half of Table 1 in evaluating proposals, and never considered those rates as binding upon the contractors.  Oral Arg. Tr. at 49.

at will.  The relative costs to the Government of the various contractors' options, therefore, was then entirely unknown.

The Government's contention that it was merely reacting to changing market conditions does not assist it in showing regulatory compliance.  In *AAA Engineering & Drafting, Inc.*, B-236034, 92-1 CPD ¶ 307, 1992 WL 70955 (Comp. Gen. March 26, 1992) and *Banknote Corp. of America*, B-250151, 92-2 CPD ¶ 413, 1992 WL 373640 (Comp. Gen. Dec. 14, 1992), the GAO found that once the Government acknowledged that the market had changed since its initial evaluation, it could not rely upon its evaluation at the time of the award to establish the reasonableness of pricing in exercising options.  Both of these cases found that relying upon the price evaluation at the time of award despite changed market conditions violated FAR § 17.207(d); thus the Government's position would merely move it from the frying pan to the fire.  The upper Table 1 NTE rates, which were the only prices that were evaluated, were no longer binding at the time the options were exercised.[21]  Therefore, defendant may not rely upon the initial reasonableness determination to show the legality of the option exercise.

Although defendants make much of the fact that the escalation rates were still considered to be binding, Luke Reply Br. at 9; Oral Arg. Tr. at 48, if the underlying NTE rate was not binding, then the question is "escalating what?"  An escalation rate must be applied to some other number; it is not clear how the escalation rate can be considered "binding" in the absence of any prescribed base price to escalate.  While the escalation rates may be binding, and they may play some role in determining the cost to the Government of performance, they alone are "too unreliable an indicator of a proposal's relative cost to the government."  *S.J. Thomas Co.*, 1999 WL 961750, at *3 (disapproving use of offerors' mark-up rates as sole basis for determining relative costs of proposals); *see West Coast Copy*, B-254044, 93-2 CPD ¶ 283, 1993 WL 476970, at *5 (Comp. Gen. Nov. 16, 1993) ("Where competing proposals for indefinite quantity contracts are evaluated on the basis of unit prices without extending those prices by estimated quantities, there is no necessary relationship between the evaluated price of a particular offeror and the actual price of performance by that offeror."); *KISS Eng'g Corp.*, B-221356, 86-1 CPD ¶ 425, 1986 WL 60624, at *3 (Comp. Gen. May 2, 1986) (comparison of average labor rates is insufficient because there is "no necessary relationship between this rate and the likely actual cost of the contract"); *see also Health Servs. Int'l Inc.*, B-247433, 92-1 CPD ¶ 493, 1992 WL 135371, at *2 (Comp. Gen. June 5, 1992) (same).

The Court cannot concur with defendants that "ongoing control of the escalation rates, in

---

[21]  Defendants argue that even after the NTE rates were declared non-binding, those prices remained in the contract (in the sense that they were not physically erased), along with the prices in the lower half of Table 1, which were not evaluated at the time of the award.  Furthermore, the awardees knew they would have to submit prices in the future for positions to be filled that were not included in the RFP.  Def.'s Reply at 47; Luke's Supp. Br. at 10 n.10.  While these contentions may be accurate, they do not render the Government's reliance on the initial reasonableness determination valid.

conjunction with the price lowering effects of competition, would ensure that pricing could not deviate substantially from the proposed rates that the Air Force found to be reasonable at the time of the Contract award." Luke's Reply at 9. Even if the escalation rates themselves continued to be binding, the lack of any control on the underlying price to be escalated deprived the rates of their essential meaning. The pricing of the options, as exercised, was not "evaluated as part of the initial competition."

### B.   Defendant Fails to Satisfy the Second Clause of FAR § 17.207(f)

Defendants have, moreover, failed to satisfy the second clause of § 17.207(f), namely that the option was "exercisable at an amount specified in or reasonably determinable from the terms of the basic contract." Defendant offers three reasons why the exercise of the contract options complied with FAR § 17.207(f)'s mandate: (1) the contract contained "points of reference" in the form of prices from historical task orders and the non-binding NTE rates, which remained in the contract; (2) competition for task orders provided the necessary price control; and (3) the contract set a total fixed price for the option period and thus the option was "priced" within the meaning of the FAR. Defendants argue that these factors, individually and in combination, provided the Air Force with sufficient pricing information that it could determine that the options were fairly and reasonably priced.

### 1.   While There is Flexibility in Price Evaluation for ID/IQ Contracts, There Must be *Some* Binding Price

It is true that "the evaluation of price or cost in the award of an ID/IQ 'umbrella' contract can be challenging, particularly in the procurement of services, because the more meaningful price competition may take place at the time individual task or delivery orders are to be issued." *CW Gov't Travel—Reconsideration*, B-295530.2, 2005 CPD ¶ 139, 2005 WL 1805945, at *4 (Comp. Gen. July 25, 2005). But Congress requires the evaluation of price in making any contract award. *See, e.g.*, 10 U.S.C. § 2305(a)(3)(A)(ii); FAR § 15.304(c)(1). Thus even when price is the least important factor for award, the agency must meaningfully consider price. *The MIL Corp.*, B-294836, 2005 CPD ¶ 29, 2004 WL 3190217, at *5 (Comp. Gen. Dec. 30. 2004); AR Tab 1 at 190. It is therefore impermissible to evaluate relative cost based only upon non-binding proposals, because such a comparison is not meaningful. *CW Gov't Travel—Reconsideration*, 2005 WL 1805945, at *4.

The same is true when evaluating the price of an option in an ID/IQ contract, which is a doubly tricky proposition. As Professors Nash and Cibinic observe, the FAR contains a "lukewarm caveat against the use of options in IDIQ contracts." Ralph C. Nash & John Cibinic, *IDIQ Contracts and Options: Varied Guaranteed Minimums*, 16 No. 9 Nash & Cibinic Report ¶ 43 (Sept. 2002) ("We have never been advocates of the use of options in indefinite delivery, indefinite quantity (IDIQ) contracts. A multiple-year IDIQ contract contains all of the advantages of an option with none of the disadvantages. One of the major disadvantages of options is that if they were not evaluated at the time of initial award, they must be competed."). That is, FAR § 17.202(b) states that an option is "normally not in the Government's interest

when . . . [a]n indefinite quantity or requirements contract would be more appropriate than a contract with options." The regulation goes on, however, to say "this does not preclude the use of an indefinite quantity contract . . . with options," which Professors Nash and Cibinic characterize as authorizing the contracting officer "to do a dumb thing." *IDIQ Contracts & Options,* 16 No. 9 Nash & Cibinic Report ¶ 43.

The Air Force argues that requiring compliance with FAR § 17.207 in the context of the exercise of an option in an ID/IQ contract "would essentially invalidate the exercise of a contract option in an ID/IQ context," Def.'s Supp. Br. at 9 n.9, but including an option in an ID/IQ contract at all is perhaps an unwise decision. Professor Nash contends that "contracting for services raises issues that the policymakers have not addressed," and that amendment of the laws or regulations may be required to eliminate problems caused by requiring binding prices in ID/IQ contracts. Ralph C. Nash, *Evaluating Price or Cost in Task Order Contracts*, 19 No. 11 Nash & Cibinic Report ¶ 52 (Nov. 2005). That may be so, but this Court's mandate is to enforce the law as currently in effect. *See Turtle Island Restoration Network v. Evans*, 284 F.3d 1282, 1296-97 (Fed. Cir. 2002) (recognizing that judicial action must halt when reaching areas of legislative judgment). When an option is nonetheless included in an ID/IQ contract, the Government has set itself the challenge of complying with the applicable laws and regulations in exercising that option. That is, the agency must "make a written determination for the contract file that exercise [of the option] is in accordance with the terms of the option, the requirements of this section, and [FAR] part 6." FAR § 17.207(f). And the regulations specify that "[t]o satisfy requirements of [FAR] part 6 regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract." *Id.* As Mr. Boudreau, the Contracting Officer, himself observed, the Air Force had "to have some pricing in the contract, so [it] could never do away with all of [the] NTEs. . . . No question about that." AR Tab 35 at 4506. The result of the TerraHealth settlement was, however, to do exactly what Mr. Boudreau said could not be done—*all* of the NTEs were declared non-binding. Although this was "not a contract about getting the cheapest doctor" but "getting value," the law still requires valid pricing in the contract.[22] Oral Arg. Tr. at 57.

In arguing that it nonetheless had a basis for evaluating the option pricing, the Air Force

---

[22] Thus, defendants' protestations that plaintiffs have provided no evidence that the cost to the Government has risen, despite the lack of binding pricing in the contract, do not assist their cause. *See* Luke's Supp. Br. at 10 n.8 ("Plaintiffs have *never* presented any specific evidence suggesting that the wage rates at which task orders have been issued since the removal of the NTE rate caps on task order proposals is actually higher than those found in the market."); Def.'s Supp. Br. at 7 n.6 ("In fact, many of the task orders that have been awarded after the NTE modifications have been for prices that were actually *lower* than the prices contained in the contractors' NTE pricing tables."). As an initial matter, the pages that the Government cites from the administrative record do not appear to support that proposition. But even if the administrative record provides support for the argument, it is irrelevant.

contends that it continued to apply "cost control measures," Oral Arg. Tr. at 48, such as enforcing the escalation rates and utilizing the NTE rates, which remained in the contract, "for reference," Oral Arg. Tr. at 55, along with the contracting officer's knowledge of the historical evidence "about what types of prices these contractors would submit." Oral Arg. Tr. at 56. At the same time, however, the Government admits that it does not "have [a] ceiling anymore," Oral Arg. Tr. at 56, and thus is unable to compare the maximum costs of the offerors' performance of the work covered by the options. But the manner in which the pricing was evaluated on this contract was to compare offerors' proposals on the basis of NTE rates. This type of evaluation only permitted the Government to evaluate the relative maximum cost. The contract modifications thus removed the only basis the Air Force possessed for meaningfully comparing the cost to the Government of the contractors' options. Notwithstanding these "cost control" measures, the price of the options was not "reasonably determinable" from the ID/IQ contracts. It is therefore unavailing for Luke to argue that the Government could (and did) waive these so-called "binding" rates, making the NTEs "far less important" than plaintiffs contend,[23] Oral Arg. Tr. at 70, because this in essence argues that even if the NTEs were still in place, the price still may not have been reasonably determinable. Luke's argument digs the hole deeper rather than providing a way out for defendants.

### 2. Competition for Task Orders is Not Sufficient to Establish Prices For the Options

The Government further relies on the competition among contractors at the task order level as establishing a sufficient control on prices that the exercise of the options was reasonable. Oral Arg. Tr. at 50; Luke Reply Br. at 3. It has been established, however, that "[t]he statutory requirement that cost to the government be considered in the evaluation and selection of proposals for award is not satisfied by the promise that cost or price will be considered later, during the award of individual task orders." *CW Gov't Travel—Reconsideration*, 2005 WL 1805945, at *4; *MIL Corp.*, 2004 WL 3190217, at *7 ("[T]here is no exception to the requirement set forth in CICA that cost or price to the government be considered in selecting proposals for award because the selected awardees will be provided the opportunity to compete for task orders under the awarded contracts."); *see also Serco, Inc.*, 81 Fed. Cl. at 493 (rejecting the Government's task order competition argument and finding that the agency "gave price neither the weight it was entitled to under the Solicitation nor that which it must be afforded under CICA and the FAR"). The Air Force may not substitute competition at the task order level for compliance with the applicable laws and regulations.

---

[23] That is, these NTE rates were only "one portion of the contract" and there was "certainly other pricing in the contract, and there was pricing for other positions that wasn't even contained in the contract." Oral Arg. Tr. at 82-83. Furthermore, if the contractor could not comply with the NTE rates, the Air Force would excuse compliance if there was some "valid reason." *Id.*; AR Tab 35 at 4505.

3.  <u>The Maximum Contract Value for the ID/IQ Contract Did Not Establish a "Price"</u>

Defendants' final argument is that the fixed prices of the overall contracts and each option period remain in effect, and therefore the price of the work to be performed in the option period was "reasonably determinable." Oral Arg. Tr. at 43-45; *id.* at 44 ("[A]lthough the way the government gets to its dollar value has changed, the overall value has not changed. . . ."). For support, defendants point to AR Tab 10 at 3389-90, which is Magnum Medical's ID/IQ contract. The prices set forth on these pages are the maximum orders to be placed under the contract. With respect to the first option period, the contract specifies a maximum, not-to-exceed order amount of $600,000,000.00. The total "Contract Minimum/Maximum Quantity and Contract Value" is a minimum of $500,000 and a maximum of $1,926,000,000. *Id.*

Defendants maintain these provisions set a fixed maximum contract value for the option period; thus the option is "priced" and the question is "how the government wants to use its dollars, not a matter of how much of the public fisc will be utilized by this contract." Oral Arg. Tr. at 85. That is, defendants argue that all the Air Force did was reallocate an existing budget between line items within a contract, which is perfectly permissible. *CCL, Inc.*, 39 Fed. Cl. at 792.

There are a number of flaws in this argument, the first being the idea that the maximum contract value was "evaluated" at the time of the initial award. Luke's Supp. Br. at 10 n.9 ("Since the price of the options in the ID/IQ Contracts was evaluated as part of the initial competition, and the options were exercised in the amount specified in the Contract award, the exercise of those options was consistent with the FAR and should be upheld."); Def.'s Supp. Br. at 10 n.10 ("Specifically, the contracting officer's analysis indicated that the price at the time of award was considered fair and reasonable—which included the option periods—and those maximums are still present. AR 5221-24. Accordingly the 'maximum amount' for the option period is the same as it is on the contract line item at the time of award and therefore determinable by the contracting officer when following FAR § 17.207(f)."). The only indication how the $1.9 billion maximum total contract amount came to be divided, resulting in a maximum value for the first option period of $600 million, is in a footnote in defendant's supplemental brief: "The amount listed on the SF-30 [sic] for the base or the options was determined by the contracting officer as an amount roughly equal to the overall $1.9 billion dollar value of the procurement over 10 years." Def.'s Supp. Br. at 9 n.9. That is, the contracting officer looked at the total contract value and made a guess as to how to divide it between the base period and the two option periods. That is not an "evaluated" price within the meaning of CICA and the FAR.

Furthermore, if this argument were accepted, it would mean that every ID/IQ contract containing a maximum contract value would be "priced" and the Government would not be required to actually evaluate individual proposals to determine how quickly an awardee might reach this "fixed" cap. This would eviscerate § 17.207 and an untold number of other laws and regulations. Plaintiffs quite reasonably respond that "a maximum amount in a contract for an option period for six different ID/IQ holders is not a fixed price that was evaluated for the options at the time of award, so it would not satisfy the requirements of 17.207(f)." Oral Arg. Tr.

at 72.  The maximum contract value for an ID/IQ contract is not a "price" satisfying the statutory and regulatory requirements for evaluation of price.

It is likewise futile to argue that "[t]here was a full year of performance after the NTE rate caps were removed, and they were still coming in under budget [that is, the maximum ID/IQ contract value] for this.  So there was ample reason for them to determine that their initial price determination for the option period was still valid."  Oral Arg. Tr. at 62.  The Government would have done an excessively poor job of contract management if it had come up against the maximum order amount of $600 million for the first option period in one year.[24]

## V.      Remedy

The Court next turns to the nature of the injunctive relief, if any, that should be awarded. Defendant requests that the Court decline to award any injunctive relief.  Defendant's Supplemental Brief Regarding Remedy ("Def.'s Supp. Remedy Br.") at 4 (docket entry 88, April 30, 2010).  However, if the Court decides to award injunctive relief, defendant alternatively requests that the Court either permit the Air Force to continue utilizing ID/IQ contract options until the first three-year option period expires, or permit the Air Force to continue utilizing the ID/IQ contract options for two years, which is the minimum length of time that the Air Force contends will be required to conduct a new procurement.  *Id.*; April 22, 2010 Evidentiary Hearing Transcript at 74-77 ("Evid. Hearing Tr.") (docket entry 84, filed Apr. 23, 2010).  Magnum Opus concedes that the so-called enterprise line task order[25] providing for psychological health services to soldiers injured in combat (referred to as "wounded warriors") and their families should be excluded from the scope of any potential injunction.  Magnum Opus's Second Supplemental Brief at 8 ("Magnum's Second Supp. Br.") (docket entry 87, Apr. 30, 2010).  With this one exception, plaintiffs request that the Court issue an immediate injunction prohibiting the Air Force from obtaining any medical services through the ID/IQ contract options.  Magnum's Second Supp. Br. at 21; Healing Staff's Supplemental Brief Regarding Remedy at 11 ("Healing Staff's Remedy Supp. Br.") (docket entry 85, filed Apr. 30, 2010).

The Court has considerable discretion in determining whether to award injunctive relief in a bid protest.  *See* 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) (acknowledging the court's "equitable discretion in deciding whether injunctive relief is appropriate"); *Acad. Facilities*

---

[24]  Because the Court has found that defendant has violated FAR § 17.207(f), it is unnecessary to reach Healing Staff's claims regarding the agency's use of performance evaluations in determining whether to exercise the options.

[25]  "Enterprise line task orders" refer to task orders for programs that are needed across the Air Force, and not just at a specific base.  Evid. Hearing Tr. at 47-48.

*Mgmt. v. United States,* 87 Fed. Cl. 441, 472 (2009) ("The decision on whether or not to grant an injunction is within the sound discretion of the trial court."). In deciding whether to issue a permanent injunction, the Court considers the following factors: (1) whether the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of the hardships to the respective parties favors the grant of injunctive relief; and (4) whether the grant of injunctive relief is in the public interest. *PGBA*, 389 F.3d at 1227; *Global Computer Enters.*, 88 Fed. Cl. at 403.

Plaintiffs have satisfied the first criterion because the Court has determined that the Air Force's exercise of the options after the NTE price ceilings were deleted violated FAR § 17.207(f). Therefore, in order to determine whether to grant injunctive relief, the Court must consider the other three factors, namely irreparable harm, balance of the hardships, and public interest.

### A.  Irreparable Harm To Plaintiffs

Plaintiffs contend that instead of exercising the options, the Air Force was required to hold a new competition for the option work, and that as a result of the Air Force's violation of the law, they have been deprived of the opportunity to compete in the new procurement. A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm. *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 791 (2009); *RhinoCorps*, 87 Fed. Cl. at 679. Thus, plaintiffs have established that they will suffer irreparable harm in the absence of injunctive relief.

### B.  Balance of Hardships

The Court must next consider whether the balance of hardships to the respective parties weighs in favor of awarding injunctive relief. *See Totolo/King*, 89 Fed. Cl. at 696. Plaintiffs contend that their businesses will be harmed if they are deprived of the opportunity to compete in a new procurement for the option work for years in the future. Magnum Opus's Response to Defendant and Intervenor's Supplemental Remedy Briefs at 13 ("Magnum's Remedy Resp. Br.") (docket entry 90, May 7, 2010); Healing Staff's Response to Defendant's Supplemental Brief Regarding Remedy at 8 ("Healing Staff Remedy Resp. Br.") (docket entry 89, May 7, 2010). Magnum Opus asserts that the gross revenue from the ID/IQ contract constituted [\*\*\*] of the company's total revenue in the year 2009. Manigault Aff. ¶ 4. Healing Staff does not specify the portion of its total revenue provided by the ID/IQ contract work, but simply asserts that it will be harmed if it loses the opportunity to compete. Healing Staff Remedy Resp. Br. at 8.

The Air Force contends that if the Court were to immediately enjoin the option work, pending a re-procurement, the harm to the Air Force would be substantial. Mr. Mirrow testified that if an immediate injunction were issued, MTFs would be prevented from efficiently performing their mission of providing patient care until new services could be procured, and even when alternative services were procured, continuity of care (the same team of medical providers treating the same beneficiaries on a continuous basis) would likely be disrupted. Declaration of

Joseph B. Mirrow ¶ 5 ("Mirrow Decl.") (docket entry 48-1, filed March 15, 2010); Evid. Hearing Tr. at 49-50.  The impact of these potential disruptions would be especially significant for programs that support wounded warriors, provide behavioral health services for post-traumatic stress disorder ("PTSD") and traumatic brain injuries, and provide substitutes for medical personnel serving in Iraq and Afghanistan.  Mirrow Decl. ¶ 5; Evid. Hearing Tr. at 50; Ex. 2 to Magnum's Second Supp. Br.

Plaintiffs claim that the Government exaggerates the degree to which an immediate injunction would disrupt the provision of medical services.  Healing Staff disputes Mr. Mirrow's assertion that continuity of care would necessarily be disrupted, claiming that Executive Order 13495 issued by President Obama in January 2009 would require any new contractor to offer the health care provider positions to the incumbent's employees.  Evid. Hearing. Tr. at 90.  However, Executive Order 13495 only applies to positions covered by the SCA, 41 U.S.C. § 351, and the vast majority of the healthcare workers employed under the ID/IQ contracts are exempt from the SCA.  Def.'s Supp. Remedy Br. at 2 n.1; Exec. Order 13,495, 74 Fed. Reg. 6103 (Jan. 30, 2009).  Thus, contrary to Healing Staff's assertions, Executive Order 13495 will not ensure continuity of care.

Plaintiffs have identified several mechanisms other than the ID/IQ contract options that they contend the Air Force could utilize to obtain medical service providers during the pendency of an injunction against performance of the work covered by the options.  The Court will address each of the alternatives identified by plaintiffs, and the degree to which they would reduce the harm to the Air Force from such an injunction.

1. General Services Administration ("GSA")/Federal Supply Schedule ("FSS") Contracts

Plaintiffs claim that if the Court enjoins the option work, the Air Force could obtain the services of licensed healthcare providers through GSA/FSS contracts.  Magnum Opus's Revised Summary of Anticipated Testimony at 3 ("Magnum's Revised Summary") (docket entry 78, Apr. 20, 2010); Evid. Hearing Tr. at 10-16.  During the evidentiary hearing on April 22, 2010, Mr. Mirrow confirmed that there are a large number of medical service contractors available under the GSA/FSS, and that several MTFs have used GSA/FSS contracts to obtain medical services in the past.  Evid. Hearing Tr. at 10, 12, 14; *see also* Exhibit 1 introduced by Magnum Opus at the evidentiary hearing on April 22, 2010 ("Ex. 1").

However, Mr. Mirrow explained that the Air Force could not quickly obtain medical service providers through GSA/FSS contracts because the Air Force would be legally obligated to formulate an acquisition plan and evaluate whether using the GSA/FSS was the acquisition strategy that would best meet the Air Force's needs under the circumstances.  Evid. Hearing Tr. at 12.  FAR part 10 requires agencies to conduct market research to determine the most suitable approach for acquiring goods and services.  *See* FAR § 10.001 (setting forth policy requiring market research); *id.* § 10.002 (describing procedures for performing market research).  Similarly, FAR part 7 requires agencies to develop acquisition plans to ensure that the

Government meets its needs in the most effective, economical, and timely manner.  FAR § 7.102 (requiring agencies to perform acquisition planning and conduct market research); *see also id.* § 7.103 (setting forth agency head responsibilities with respect to acquisition plans).  In March 2009, AFFARS Mandatory Procedure ("AFFARSMP") § 5301.9001 instituted new and even more intense acquisition review requirements within the Air Force, rendering the acquisition process even more time-intensive.  Mirrow Decl. ¶ 8; AFFARSMP § 5301.9001(b).

This multitude of procurement regulations necessarily creates a lengthy process for the Air Force to obtain the medical services through any mechanism other than the ID/IQ contract options.  During the evidentiary hearing on April 22, 2010, Mr. Mirrow testified that the Air Force would require two years to complete a new procurement for the medical services.  Evid. Hearing Tr. at 74-77.  Plaintiffs challenged Mr. Mirrow's assessment, claiming that the Air Force could re-use some of the work that it had previously undertaken in deciding to utilize the ID/IQ contracts at issue in this protest, and that the process should take less than two years because the Air Force already knows what its requirements for health care services are.  Evid. Hearing Tr. at 76-77; Magnum's Remedy Resp. Br. at 11; Healing Staff's Remedy Resp. Br. at 5.  But Mr. Mirrow explained that it would be necessary, in the face of an injunction such as that sought by plaintiffs, to prepare another acquisition plan and conduct additional market research to assess which procurement strategy would best meet the Air Force's needs under the circumstances.  Evid. Hearing Tr. at 76-77.  In addition, staffing constraints for the Air Force Commodity Council do not permit more than one acquisition to proceed at a time.  Mirrow Decl. ¶ 8.  Therefore, other procurement work would need to be pushed aside in order for the acquisition process for the new procurement for medical services to be completed.  *Id.*  Furthermore, defendant correctly observes that Robert Manigault and Gerald Gregory, plaintiffs' witnesses who contended that the process should take less than two years, have no experience in the federal acquisition planning process.  Defendant's Response to Plaintiffs' Supplemental Remedy Briefs at 9-10 ("Def.'s Remedy Resp. Br.") (docket entry 91, May 7, 2010); Evid. Hearing Tr. at 92, 124-25.

Defendant has also established that using the GSA/FSS schedule would cause the Air Force to incur substantial user fees.  Mr. Mirrow's assessment of these user fees was based upon the erroneous assumption that the Court would immediately enjoin all existing task orders under the ID/IQ contracts, not just the option work.  Evid. Hearing Tr. at 39-40.  However, even if only the option work were enjoined, these fees would likely still be significant.  If the Air Force were to use an assisted acquisition through the GSA/FSS,[26] Mr. Mirrow estimated that external re-procurement costs for a $350 million annual program would potentially amount to $10.5 million.  Mirrow Decl. ¶ 11; Evid. Hearing Tr. at 56.  Furthermore, an additional one percent industrial funding fee would be required by the GSA.  Evid. Hearing Tr. at 56.

---

[26]  In an assisted acquisition, GSA's Assisted Acquisition Services Office provides acquisition planning and development services to other agencies pursuant to 40 U.S.C. § 501. *See* Office of Assisted Acquisition Servs., *Assisted Acquisition Overview*, http://www.gsa.gov/ Portal/gsa/ep/contentView.do?contentType=GSA_OVERVIEW&contentId=23707.

Plaintiffs argue that these fees may be offset by potential cost savings from using the GSA/FSS contracts as opposed to the ID/IQ contract options. Magnum's Second Supp. Br. at 10-11; Healing Staff's Remedy Supp. Br. at 7. Although plaintiffs have presented evidence that in a select sample of instances, the GSA/FSS rates are lower, neither party has presented the Court with a comprehensive comparison of the rates, leaving the Court incapable of reaching a conclusion upon this issue. *See* Exhibit 2 introduced by Magnum Opus at the evidentiary hearing on April 22, 2010 ("Ex. 2"); Evid. Hearing Tr. at 58. It is unnecessary for the Court to do so, however, because the Court concludes that solely as a result of the time-consuming acquisition planning process, use of the GSA/FSS schedule would not significantly mitigate the potential harm to the Air Force of an immediate injunction.

### 2. Small Business Set-Asides

Plaintiffs also suggest that the Air Force might fulfill some of its need for health care services through the use of section 8(a) Small Business set-asides. Evid. Hearing Tr. at 19-20. But, as Mr. Mirrow correctly testified, an 8(a) set-aside "is not a [contracting] vehicle." *Id.* at 20. A section 8(a) Small Business set-aside permits the agency to limit competition for certain acquisitions to businesses designated as minority-owned small businesses pursuant to § 8(a) of the Small Business Act, 15 U.S.C. § 637(a), in conjunction with the SBA. *See* FAR subpart 19.8. Using an 8(a) or any other type of small business set-aside would not relieve the Air Force of its obligation to perform the acquisition planning and market research required by the FAR. The availability of small business set-asides thus does little to lessen the hardship to the Air Force from an immediate injunction.

### 3. TRICARE

Plaintiffs alternatively contend that the Air Force could obtain the necessary medical services through Clinical Services Agreements ("CSAs") under the TRICARE contract, which is an overarching contract for providing purchased care through a civilian network for medical care beneficiaries. Magnum's Revised Summary at 4-5; Healing Staff's Remedy Supp. Br. at 9; Mirrow Decl. ¶ 5; Evid. Hearing Tr. at 22-23. During the evidentiary hearing, plaintiffs established that in some instances on some Air Force bases, CSAs under TRICARE are being used to provide services similar to those provided under the ID/IQ contracts at issue in these protests. Evid. Hearing Tr. at 23-24. However, if a significant number of additional patients were moved to TRICARE, it is unclear whether the TRICARE network would be able to accommodate the increased workload. Mirrow Decl. ¶ 5.

Mr. Mirrow also explained that the TRICARE contract itself is currently the subject of a bid protest, and that the CSAs would only be available until March of 2011, at which time they would need to be re-competed. Evid. Hearing Tr. at 66. Magnum Opus argues that the outcome of the TRICARE bid protest is uncertain, and that the Air Force could obtain services under a bridge contract even if the new TRICARE contract award were enjoined. Magnum's Second Supp. Br. at 12-13. Even assuming the truth of these assertions, however, the pending protest would increase the burden to the TRICARE network from a significant increase in patient

volume.

Moreover, there are other difficulties with utilizing CSAs to obtain the medical services currently provided through the MTFs. Mr. Mirrow explained that in many instances, prices under the CSAs are higher, since awards are negotiated with the TRICARE contractor servicing a particular MTF as opposed to being competed among ID/IQ contract holders. Evid. Hearing Tr. at 67. Magnum Opus challenges Mr. Mirrow's assessment on the ground that it was based upon his review of CSAs prior to the adoption of the ID/IQ contracts, but fails to identify any reason that his conclusion should have changed since that time. Magnum's Second Supp. Br. at 13. Mr. Mirrow also explained that using the CSAs would detract from the Air Force's ability to meet its small business goals, because the TRICARE contractors are not small businesses. Evid. Hearing Tr. at 67. Using CSAs would potentially reduce the Air Force's ability to hold contractors responsible for their performance, because TRICARE contractors report directly to the TRICARE Management Activity, not the Air Force. *Id.* at 68. In addition, the services available under the CSAs are not identical to the services available through the ID/IQ contracts, and some patients would incur cost shares and co-payments that they would not incur if their care were provided through the ID/IQ contracts. Evid. Hearing Tr. at 69-70. For these reasons, the availability of CSAs would not significantly ameliorate the potential harm to the Air Force from an immediate injunction.

### 4. Army Contracts

Plaintiffs also assert that the Air Force could obtain the medical services in question under existing ID/IQ contracts issued by the Army. Magnum's Second Supp. Br. at 13-14; Evid. Hearing Tr. at 33-35; *see also* Exhibit 5 introduced by Magnum Opus at the evidentiary hearing on April 22, 2010 ("Ex. 5"). Mr. Mirrow explained that these Army contracts would not be able to absorb a significant portion of the Air Force's requirements for medical services, because they are subject to ID/IQ maximum caps. Evid. Hearing Tr. at 64. It is unlikely that the Army would be willing to give a significant portion of its maximum caps, which were designed to meet the Army's needs, to the Air Force. *Id.* To the extent that the Army did have excess capacity available under the contracts, the Army would charge the Air Force a fee to utilize their contract vehicles. *Id.* Air Force contracting personnel would also require training to learn to oversee task orders issued through the Army contracts. *Id.* Once again, the alternative mechanism recommended by plaintiffs is rife with its own associated problems, and would not meaningfully reduce the harm to the Air Force from an immediate injunction.

### 5. Base-Level Procurements

Plaintiffs claim that "[y]et another alternative available to the Government" if the ID/IQ contract options were unavailable "is the use of base level procurements." Healing Staff's Remedy Supp. Br. at 8; *see also* Magnum's Second Supp. Br. at 12 ("Magnum simply puts forth that the Air Force MTFs can procure their licensed healthcare provider services through individual base procurements posted on FedBizOpps without undue delay or expense while the

Commodity Counsel works on its reprocurement.").[27]   In support of this alternative, plaintiffs submitted into evidence a chart detailing "51 separate procurements for health services issued by individual U.S. Air Force Bases . . . ."  Exhibit 3 introduced by Magnum Opus at the evidentiary hearing on April 22, 2010 ("Ex. 3").   Mr. Mirrow explained that base level procurements such as those detailed in plaintiff's exhibit are often used when the services available under the ID/IQ contracts cannot fill a specific need of an MTF.  Evid. Hearing Tr. at 61-62.  For example, if an MTF wanted to hire a professional who would not work at the MTF—a "non-personal services type contract"—or it wanted to procure a healthcare professional for only a short-term or temporary period, neither of these services would be available under the ID/IQ contracts and the Air Force would be required to use a different contracting vehicle.  *Id.* at 62.

While the Air Force currently utilizes base-level procurements to some extent, plaintiffs significantly over-simplify how complicated it can be to accomplish such acquisitions.  Conducting a base-level procurement through the FedBizOpps website is not as simple as purchasing a commercial product from an online website.  *See id.* at 62.  If an Air Force base decides to use a base-level procurement, the MTF has to conduct all of the acquisition planning and market research required by the FAR for the acquisition.  *Id.*  For example, during the evidentiary hearing, Mr. Mirrow testified that in one instance when Lackland Air Force Base did not use the ID/IQ contracts, the base contacting office needed 12 to 15 months to complete the necessary acquisition planning before it could finalize the decision to use the GSA/FSS to obtain the necessary medical services.[28]  Evid. Hearing Tr. at 47.

Passing the buck to the individual base contracting offices does not relieve the burden on the Air Force.  Indeed, the ID/IQ contracts were created by the Air Force precisely to prevent Air

---

[27] With limited exceptions, agencies must publish notice of all competitive acquisitions at a centrally maintained "Governmentwide Point of Entry," FAR §§ 5.002, 5.003, which is now done on the web via the Federal Business Opportunity website, FedBizOpps.  *Id.* § 5.201(d); *see FBO Electronic Interface: Overview*, https://www.fbo.gov/?s=generalinfo&mode =list&tab=list&tabmode=list&static=interface ("FedBizOpps (FBO) has been designed as a single point of entry for Federal buyers to publish and for vendors to find posted Federal business opportunities across departments and agencies.").

[28] Healing Staff contends that this example demonstrates that the Air Force could obtain the necessary services in 12 to 15 months, as opposed to two years, if the Court were to issue an immediate injunction.  Healing Staff's Remedy Resp. Br. at 3-4.  However, even assuming that other Air Force bases could conduct their acquisition planning in the same time period as Lackland Air Force Base, the 12 to 15 month estimate only encompassed the acquisition planning period.  Evid. Hearing Tr. at 47.  It did not take into account time necessary to award a contract and get health care service workers into the MTFs and providing services.  In addition, depending upon the procurement vehicle selected during the acquisition planning process, additional time might be necessary to prepare a request for proposals, evaluate proposals, conduct discussions with offerors, and request proposal revisions.

Force bases from having to go through the acquisition planning process for each individual procurement of healthcare services, a requirement that is waived if the base procures services through the ID/IQ contracts. *Id.* at 52 ("No, [the individual base offices] don't have to go through that [acquisition planning process] on the MATO [ID/IQ contract]. According to the Air Force FAR Supplement, if [individual bases] follow the terms and conditions of the basic contract, and do a task order award, [base personnel] do not have to do that."). In other words, plaintiffs' proposed solution regarding base-level procurements creates the exact problems that the ID/IQ contracts were designed to remedy in the first instance.

> ### 6.  Contract Extensions and Options On Task Orders Issued During the Base Period of the ID/IQ Contracts

Plaintiffs also suggest that, as a short-term solution, the Air Force could obtain medical services through task orders issued during the base period of the ID/IQ contracts. Healing Staff Supp. Remedy Br. at 4-5; Magnum's Second Supp. Br. at 9-10. Plaintiffs note that there are more than 800 existing task orders currently in place that were issued during the base period of the ID/IQ contracts, and that some recently issued task orders will not expire for nearly a year. Magnum's Second Supp. Br. at 8, 10; *see also* Evid. Hearing Trans. at 39; Mirrow Decl. ¶ 4. Plaintiffs also contend that the Air Force could extend task orders issued during the base period of the ID/IQ contract for an additional six months pursuant to FAR § 52.217-8. Healing Staff's Supp. Remedy Br. at 4-5; Magnum's Second Supp. Br. at 9-10; *see also* FAR § 52.217-8 ("The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months."). By utilizing the existing task orders and extensions under FAR § 52.217-8, plaintiffs claim that in some instances, the Air Force will be able to obtain up to an additional 18 months of medical services. Magnum's Remedy Resp. Br. at 8. In addition, Healing Staff suggests that the Air Force could obtain medical services even further in the future by exercising options on task orders that were issued during the base period of the ID/IQ contracts. Healing Staff's Remedy Supp. Br. at 5.

Defendant responds that many of the task orders issued during the base period of the ID/IQ contracts are scheduled to expire less than a year in the future. Def.'s Remedy Resp. Br. at 6. Defendant's analysis revealed that 96% of Magnum Opus's existing task orders and 88% of Healing Staff's existing task orders are scheduled to expire by October 1, 2010. *Id.* In addition, many of plaintiffs' existing task orders issued during the base period of the ID/IQ contract do not contain FAR § 52.217-8. *Id.* at 6-7. Defendant analyzed all of Magnum Opus's current task orders, and two-thirds of Healing Staff's current task orders, and found that only 55% of Magnum Opus's task orders and 30% of Healing Staff's task orders contained FAR § 52.217-8. Therefore, only a relatively small portion of the existing task orders could benefit from the six-month extension. However, even if *all* existing task orders contained FAR § 52.217-8, this proposed solution would not effectively address the prospective harm to the Air Force. As previously discussed, Mr. Mirrow testified that the Air Force would require two years to complete its re-procurement of the medical services, and a six-month extension on task orders expiring in October 2010 would still leave the Air Force with a 13.5 month gap in medical services if the Court were to issue an immediate injunction. Evid. Hearing Tr. at 74-77.

Moreover, the use of existing task orders would provide the Air Force with no assistance in fulfilling new requirements that had not previously been obtained under prior task orders.

Healing Staff also argues that the Air Force could continue to obtain medical services for a longer period of time by exercising options on task orders issued during the base period of the ID/IQ contracts.  Healing Staff's Remedy Resp. Br. at 6-8.  In response, defendant points out that the ID/IQ contracts contain ordering clauses providing that orders can only be issued between August 14, 2006 and November 14, 2009.  Def.'s Remedy Resp. Br. at 7 n.7; AR 3425-26; 3924-25.  Defendant further notes the contracts contain a clause providing that the Air Force may only issue task orders during the effective period of the contract and that the contractor cannot be required to perform any task order issued or option exercised during the last year of the contract more than one year after the date that the contract expired.  AR 3590; FAR 52.216-22(d).  Specifically, the clause provides that:

> Any order issued during the effective period of this contract and
> not completed within that period shall be completed by the Contractor
> within the time specified in the order.  The contract shall govern the
> Contractor's and Government's rights and obligations with respect to that
> order to the same extent as if the order were completed during the
> contract's effective period; provided, that the Contractor shall not be
> required to make any deliveries under this contract after one year from the date
> of any task order issued or task order option period exercised during the
> last year of this contract.

AR 3590; FAR 52.216-22(d).  Thus, pursuant to these clauses, for task orders or option periods exercised between August 14, 2008 and November 14, 2009, work would cease by November 14, 2010.  It therefore appears that the Air Force would not be able to obtain medical services after November 14, 2010 through options on task orders issued during the base period of the ID/IQ contracts.  For these reasons, Healing Staff's proposal regarding exercising options on existing task orders would not significantly mitigate the harm to the Air Force of an immediate injunction.

### 7.  Bridge Contracts

Plaintiffs argue that to ensure continuity of care, the Air Force could obtain the medical services in question under bridge contracts until a new competitive procurement could be conducted.  Healing Staff's Remedy Supp. Br. at 6; *see also* Magnum's Second Supp. Br. at 19; Evid. Hearing Tr. at 25, 120-21.  However, although it might be possible for the Air Force to utilize bridge contracts, there would be several significant problems with doing so.

The most significant of these problems is that the Air Force would need to be able to issue the requisite justification and approval in order to limit competition for the bridge contracts.  *See* 10 U.S.C. § 2304(c); Magnum's Second Supp. Br. at 16; Evid. Hearing Tr. at 72.  To justify other than full and open competition, the Air Force would need to establish that one of the

following criteria can be satisfied: (1) only one responsible source could satisfy the agency's requirements; (2) the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits proposals; (3) limiting competition is necessary for industrial mobilization; (4) the terms of an international agreement allow limited competition; (5) limited competition is specifically authorized by statute; (6) national security requires that the number of sources be limited; or (7) full and open competition is not in the public interest. FAR §§ 6.302-1 through 6.302-7. A need for supplies and services of an unusual and compelling urgency, the justification that would most likely be applicable in the present case, would only permit the Air Force to award bridge contracts for a one-year period without special approval from the agency head. FAR § 6.302-2(d)(ii).

Furthermore, even if competition for the bridge contracts could be limited, the Air Force would nevertheless be legally obligated to request offers from as many potential sources as practicable under the circumstances. 10 U.S.C. § 2304(e); FAR § 6.303-2(a)(6). During the evidentiary hearing, Mr. Mirrow stated that there were approximately 200 companies that provide the type of medical services at issue in these bid protests. Evid. Hearing Tr. at 72. As Mr. Mirrow observed, it is unlikely that these companies would concede that competition for the bridge contracts should be limited to exclude them as potential competitors. *Id.* In addition, it appears from the parties' briefs that there is already contention regarding whether the Air Force should be obligated to issue bridge contracts to all of the original six ID/IQ contract holders. Magnum's Second Supp. Br. at 16; Healing Staff's Remedy Supp. Br. at 6.

Moreover, Mr. Mirrow explained that if the Air Force were to utilize bridge contracts, the Air Force's limited pool of contracting staff would be required to expend their time and resources getting bridge contracts in place, instead of preparing for the new procurement. Evid. Hearing Tr. at 72; *see also* Mirrow Decl. ¶ 8 ("Staffing constraints do not allow more than one acquisition to proceed at a time . . . ."). In addition, Mr. Mirrow noted that bridge contracts are often more expensive than competitive awards because they are only designed to last for a short duration. Evid. Hearing Trans. at 72; *see also Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 401 (2008) ("A bridge contract is used to cover immediate minimum agency needs while a bid protest or other action is pending, or to cover a transition period between competitive procurements.") (internal citations omitted). Thus, although bridge contracts are a potentially useful tool for the Air Force, they are not the cure-all that plaintiffs suggest.

Some of the alternative mechanisms for obtaining health care services identified by plaintiffs, or some combination of such mechanisms, would enable the Air Force to meet some of its needs. However, plaintiffs have not identified any mechanism or combination of mechanisms that would ensure that there is no gap in health care services while the Air Force conducts a new procurement. Therefore, given the importance of these necessary medical services to the Air Force's mission, although plaintiffs may well suffer economic injury if they are deprived of an immediate opportunity to compete in a new procurement, the harm to the Air Force from an immediate injunction is at least equally as significant.

*C. Public Interest*

Finally, the Court turns to the question of whether the public interest weighs in favor of granting an injunction.  The public interest is, without doubt, served by ensuring that Government officials follow applicable procurement statutes and regulations.  *See, e.g., Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 80 (2007); *Hunt Bldg. Co., Ltd. v. United States*, 61 Fed. Cl. 243, 280 (2004); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997).  In the present case, because the exercise of the options of the four awardees did not conform to the requirements of the FAR, it is in the public interest to take action to correct the illegality that occurred.  *See Heritage of Am.*, 77 Fed. Cl. at 80.  However, the public interest is also served by maintaining uninterrupted medical care and continuity of care for wounded veterans, service members, and their families.  *See IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 143 (2006) ("The interests of the military families bear repeating as part of the public interest."); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 222 (2004) (holding that the public interest is served through ensuring continuity in TRICARE medical administration services for veterans and families of service members); *Sierra Military Health Servs. v. United States*, 58 Fed. Cl. 573, 585 (2003) ("Available and adequate health care for retired [military] personnel is, itself, a matter of considerable public interest.").

While the latter concern is arguably entitled to more significant weight than the former, it is possible to tailor injunctive relief to minimize the potential harm to recipients of medical care.  *See, e.g., Heritage of Am.*, 77 Fed. Cl. at 78-81 (tailoring injunctive relief to minimize harm to the Government).  During the evidentiary hearing, Mr. Mirrow testified that if the Air Force were not permitted to utilize the first three-year option period in its entirety, the next best alternative to minimize the harm to recipients of medical care would be for the Court to provide the Air Force two years from the date of its opinion and order to complete a new procurement.  Evid. Hearing Tr. at 73-74.  The parties appear to agree that, pursuant to FAR § 52.249-4 and the Court's authority to tailor injunctive relief, the Court may enjoin performance of any work under the options two years from the date of its opinion and order, thereby truncating the first option period.  Magnum's Second Supp. Br. at 3; Healing Staff's Remedy Supp. Br. at 2-3; Def.'s Supp. Remedy Br. at 7; Defendant-Intervenor's Supplemental Brief Pursuant to the Court's April 22, 2010 Order at 2 (docket entry 86, Apr. 30, 2010); *see also* FAR § 52.249-4 ("The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest.").

After carefully weighing the potential harms to plaintiffs, the Air Force, the recipients of medical care, and the public, the Court concludes that a tailored injunction prohibiting the Air Force from obtaining work under the ID/IQ contract options after May 13, 2012 is the best injunctive relief that the Court can provide, given the facts of this case.[29]  This tailored injunction

---

[29]  The Court has determined that it is unnecessary to exempt the enterprise line task order to provide psychological health services for wounded warriors and their families from this tailored injunction, given the two-year period that it provides the Air Force to obtain those

will limit potential disruptions in medical care while the Air Force undertakes the required re-procurement, but will also limit the period during which the Air Force obtains work under contract options that were exercised in violation of applicable law and regulations. *See* Evid. Hearing Tr. at 74-75.

The Court recognizes that this limited injunction will still result in harm to plaintiffs, because they will be deprived of the opportunity to compete for the work during this two-year period. However, the parties have only presented evidence on the viability of either an immediate injunction or an injunction taking effect two years in the future. Given these two alternatives, in light of the fact that medical care for current and retired service members and their families is at stake, the Court must choose the latter. Exempting the enterprise line task order for psychological health services from an immediate injunction, as Magnum Opus has proposed, will not adequately mitigate the harm to the Air Force, because psychological health services are only one of numerous essential medical services provided under the ID/IQ contract options. If some other services of less importance to the Air Force, its current and retired service members and their families were at issue, the outcome might be different, but those are not the facts presented to the Court in this case.

Although the tailored injunction will not put plaintiffs in as good a position as they would have been if the Air Force's violation of law had never occurred, it will put them in a better position than no injunctive relief at all. Absent the tailored injunction, the Air Force could make full use of both three-year option periods, leaving plaintiffs unable to compete for the work for six years. Assuming that plaintiffs are eligible to compete under the Air Force's new re-procurement, the tailored injunction will at least provide them with limited relief in the form of an opportunity to compete to provide the work two years in the future.

## CONCLUSION

For the foregoing reasons, defendant and defendant-intervenor's motions to dismiss are **DENIED.** Magnum Opus and Healing Staff's motions for judgment upon the administrative record are **GRANTED**, and defendant and Luke's motions for judgment upon the administrative record are **DENIED**. The Court hereby **ORDERS** that:

1. Defendant is enjoined from obtaining work under the ID/IQ contract options after May 13, 2012. In addition to requiring task orders that have already been issued under the options to be terminated as of May 13, 2012, any subsequent task orders issued under the options must also be concluded by May 13, 2012.

2. Defendant shall utilize this two-year period to conduct the necessary acquisition planning and to put in place a vehicle or vehicles to supply health care providers effective

---

services through a re-procurement and possible alternative vehicle.

May 13, 2012 in compliance with applicable law and regulations.[30]

The Clerk shall enter judgment in favor of plaintiffs for the equitable relief described above.

Some information contained herein may be considered protected information subject to the protective order entered in this action on February 23, 2010 (docket entry 12).  This opinion shall therefore be filed under seal.  The parties shall review the opinion to determine whether, in their view, any information should be redacted prior to publication in accordance with the terms of the protective order.  The Court **FURTHER ORDERS** that the parties shall file, within 10 days of the filing of this opinion, a joint report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for their proposed redactions.

**IT IS SO ORDERED.**

s/ George W. Miller
GEORGE W. MILLER
Judge

---

[30] In one of its supplemental filings, Magnum Opus requests attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).  Magnum's Second Supp. Resp. Br. at 14.  EAJA requires a party claiming fees to file an application with the Court within 30 days of the entry of a final judgment.  28 U.S.C § 2412(d)(1)(B); *see J.M.T. Mach. Co. v. United States*, 826 F.2d 1042, 1046-47 (Fed. Cir. 1987) ("[A]n attorney fee application must be filed within 30 days of a final disposition in an adversary adjudication. The 30-day filing period is a jurisdictional prerequisite to the awarding of an attorney fee.").  Moreover, a judgment is only considered "final" within the meaning of EAJA when the time for appeal has expired without action by the parties.  28 U.S.C. § 2412(d)(2)(G); *see SAI Indus. Corp. v. United States*, 421 F.3d 1344, 1345 (Fed. Cir. 2005).  Since any judgment entered contemporaneously with the filing of this opinion has not yet become "final," the Court **DENIES WITHOUT PREJUDICE** Magnum Opus's request for attorneys' fees.  If Magnum Opus wishes to renew its request for attorneys' fees and expenses pursuant to EAJA, it may do so in an EAJA application at the appropriate time.